**Electronically Filed
Supreme Court
SCWC-11-0000595
10-MAY-2013
10:17 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

CHEYNE DE LA GARZA, Petitioner/Defendant-Appellant,

vs.

STATE OF HAWAIʻI, Respondent/Plaintiff-Appellee.

SCWC-11-0000595

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0000595; CR. NO. 08-0421(4); S.P.P. NO. 10-1-0021(4))

MAY 10, 2013

RECKTENWALD, C.J., NAKAYAMA, ACOBA, MCKENNA, AND POLLACK, JJ.

OPINION OF THE COURT BY POLLACK, J.

Petitioner Cheyne De La Garza (Petitioner) seeks review of the Intermediate Court of Appeals' (ICA) August 23, 2012 judgment, affirming the Circuit Court of the Second Circuit's (circuit court) July 28, 2011 order dismissing Petitioner's Hawaiʻi Rules of Penal Procedure (HRPP) Rule 40 petition for post-conviction relief.

Petitioner asserts that the ICA gravely erred in affirming the circuit court's order because the manner in which the Hawaiʻi Paroling Authority (HPA) "amended" his minimum term of imprisonment from eighteen months to five years was in violation of his constitutional right to due process.

We hold that the ICA erred in concluding that Petitioner waived his due process claim relating to the HPA's nondisclosure of adverse materials in Petitioner's HPA file and accordingly vacate the ICA judgment and circuit court order, and remand to the circuit court for a HRPP Rule 40 evidentiary hearing consistent with this opinion.

I.

A.

On May 1, 2009, Petitioner pleaded no contest to one count of assault in the first degree in violation of Hawaiʻi Revised Statutes (HRS) § 707-710(1) and one count of kidnapping as a Class B felony in violation of HRS § 707-720(3). Petitioner's conviction arose out of an incident in which Petitioner restrained the complainant (Complainant), whom he had previously been romantically involved with, in his vehicle and assaulted her, causing serious bodily injury to her. The circuit

-2-

court[1] sentenced Petitioner on June 26, 2009 to ten years imprisonment for each count, with the terms to run concurrently.[2]

On October 12, 2009, the HPA held a hearing to set Petitioner's minimum term of imprisonment (first hearing), pursuant to HRS § 706-669.[3]  Prior to the hearing, the HPA was required to obtain Petitioner's presentence report, which included Complainant's victim impact statement as an addendum to the report.[4]  The prosecutor also submitted a written letter to the HPA with his recommendation for Petitioner's minimum term. Petitioner and defense counsel were present at the October 12 hearing.  Neither the prosecutor nor Complainant attended the hearing.

On the same day as the first hearing, the HPA issued a notice and order (First Minimum Term Order) setting Petitioner's minimum term of imprisonment at eighteen months for each count,

_____

[1]     The Honorable Richard T. Bissen, Jr. presided over the circuit court proceedings in this case.

[2]     Petitioner was also ordered to pay restitution and fees.

[3]     The HPA is charged with determining the minimum term of imprisonment that a person sentenced to an indeterminate or an extended term of imprisonment must serve before becoming eligible for parole.  HRS § 706-669(1) (1993).  The guidelines upon which these determinations are made are established by the HPA.  HRS § 706-669(8).  See HPA's Guidelines for Establishing Minimum Terms of Imprisonment (1989), available at http://dps.hawaii.gov/wp-content/uploads/2012/09/HPA-Guidelines-for-Establishing-Minimum-Terms-of-Imprisonment.pdf [hereinafter HPA Guidelines].

[4]     HRS § 706-669(2) (1993) provides that "[b]efore holding the [minimum term] hearing, the authority shall obtain a complete report regarding the prisoner's life before entering the institution and a full report of the prisoner's progress in the institution."  HRS § 806-73(b)(3)(B) (Supp. 2009) provides that "[a] copy of a presentence report or investigative report shall be provided" to the HPA.

-3-

to expire on December 20, 2010.  The HPA set Petitioner's level of punishment at Level II and identified "Degree of Injury to Person" as the significant factor used in determining Petitioner's level of punishment.[5]  A Level II punishment for a ten year maximum term of imprisonment will generally result in a minimum term of three to five years under the HPA Guidelines. HPA Guidelines at 2.  In Petitioner's case the HPA deviated downward from its guidelines based on his "Character and Attitude With Respect to Criminal Activity and/or Lifestyle."[6]

Over a month after issuing the First Minimum Term Order, the HPA received a letter from the prosecutor, dated November 23, 2009, advising the HPA that Complainant and her family had not been notified about the first hearing "due to an error in communication" by the prosecutor's office.[7]  The prosecutor requested that Complainant and her family "be permitted to appear before the [HPA] and submit oral and written statements addressing the [Petitioner]."  However, the prosecutor

_____

[5]     The HPA Guidelines provide that the minimum term of imprisonment will generally fall within one of three levels, with the level of punishment based on the maximum term of imprisonment imposed by the sentencing court and subjective criteria including the nature of the offense, the degree of injury/loss to person or property, and the offender's criminal history.  HPA Guidelines at 2-3.

[6]     The HPA Guidelines provide that "all deviations [from the guidelines] shall be accompanied by written justification and be made a part of the Order Establishing Minimum Terms of Imprisonment[.]"  HPA Guidelines at 1.

[7]     The HPA later explained to Petitioner in a letter dated July 27, 2010 that unless the complainant requested direct notification from the HPA, the HPA's practice was to notify the prosecutor's office of the minimum term hearing date.  The prosecutor's office would then notify the complainant of the hearing date through a victim advocate.  In this case, it appears that no request for direct notification was made.

acknowledged that "a minimum term has already been set and that the prisoner has been transferred to the Maui Community Correctional Facility." The prosecutor did not request invalidation, reconsideration, or amendment of the minimum term. A notation on the letter indicated that a copy of the letter was sent to defense counsel.

Thereafter, in a letter dated December 15, 2009, Complainant's aunt (Aunt) wrote to the HPA requesting that the HPA "reconsider" the minimum term. Aunt's letter stated, "We do not wish to burden the Board with an additional hearing and the Board's time and expense that comes with it, but we do respectfully ask that you accept the enclosures as [Complainant's] testimony and we respectfully ask that you reconsider the minimum that was set of 1.6 years." Aunt enclosed a copy of Complainant's victim impact statement and a portion of the transcript from the circuit court's sentencing proceedings. The letter concluded with Aunt's request that the "Board reconsider a minimum term of at least 3.4 years." Aunt's letter did not contain a notation indicating that Petitioner, defense counsel, or the State was provided with a copy of the letter and the attachments.

In a letter dated January 20, 2010, the HPA wrote to Aunt acknowledging receipt of her letter. The HPA advised Aunt that the information she had provided had been made a part of Petitioner's case file and would "be reviewed when we undergo the

parole process in October 2010." The HPA wrote, "The minimum sentence of one year, six months does not mean that the defendant will be released on parole at that time.[8] We encourage you and your niece to resubmit a letter prior to his parole hearing." The letter does not contain a notation indicating that a copy of the letter was provided to Petitioner, defense counsel, or the State.

In a second letter to the HPA dated March 10, 2010, Aunt wrote, "Below please find my testimony for the minimum term hearing scheduled for Friday, 3/19/10 at Maui Community Correctional Facility." Along with her written testimony, Aunt included a map of the locations where Petitioner had driven Complainant on the day of the incident, and photographs of the injuries Complainant sustained.

Aunt's five-page, single-spaced statement recounted the nature of Petitioner and Complainant's relationship as well as the events of the day of the incident.[9] Aunt stated that "[Petitioner] has already started on work furlough because of the 1.6 minimum," and that "a 1.6 month minimum term is a slap in the

---

[8] Pursuant to HRS § 706-670(1) (Supp. 2010), a "person sentenced to an indeterminate term of imprisonment shall receive an initial parole hearing at least one month before the expiration of the minimum term of imprisonment determined by the [HPA]." If the HPA does not grant parole at that initial hearing, additional hearings are held at "twelve-month intervals or less until parole is granted or the maximum period of imprisonment expires." Id. The HPA may decline to set a parole date, and release becomes mandatory only upon expiration of the maximum term of imprisonment. HRS § 706-670(5) (1993).

[9] At the March 19, 2010 hearing, Aunt did not read verbatim from her written statement. Significant portions of her written statement were not orally conveyed at the hearing.

face to the victim." She further claimed that "[a]fter sentencing, [Petitioner] made statements like 'my attorney is in with the parole board, lucky if I even do a year,'" and that Petitioner "new [sic] his statements would get to [Complainant], which was his plan." Aunt concluded by asking the HPA to "consider that [Petitioner's minimum term] should not be less than a minimum of 3.8 years of his 10 year sentence[.]"

Aunt's second letter also does not indicate that the letter or its enclosures were provided to Petitioner, defense counsel, or the State.

### B.

On March 19, 2010, the HPA held a second minimum term hearing (second hearing).[10]

At the hearing, Petitioner, Complainant, Aunt, a victim witness counselor, and a Maui County deputy prosecuting attorney were present.[11] Defense counsel was not able to attend the hearing and instead appeared by telephone. He explained, "You know, I had some surgery, I just got the stitches out the other

---

[10] The HPA is composed of three members who are appointed by the governor for four-year terms, one of whom serves as chairperson. HRS § 353-61 (Supp. 2010). At the first hearing, all three HPA members, Chairman Albert Tufono and members Dane Oda and Roy Reeber, were present and determined Petitioner's minimum term of imprisonment. At the second hearing, only Chairman Tufono and member Oda were present. Pursuant to Hawaiʻi Administrative Rules § 23-700-2(b) (1992), formal decisions of the HPA are not "conclusive and final unless at least two members are in agreement."

[11] The prosecutor who appeared for the second hearing was not the same prosecutor who sent the letter to the HPA recommending a minimum term for the first hearing and who notified the HPA about the failure to notify Complainant about the first hearing.

day. And I'm going to court this morning, I start a trial. It's not that I didn't want to be there." Petitioner was not asked whether he was previously aware of or agreed to counsel's participation through speaker phone.

Chairman Albert Tufono began the hearing by explaining that the HPA had scheduled the second hearing because "the first time we set this minimum, we did not give the family the opportunity to be heard in this area."[12] Defense counsel responded, "I understand. We went through all of their statements and all the reports and everything else [at the first hearing], but, I mean, I'm sure they have a right to talk." Chairman Tufono continued, "Yeah. So we're giving them the right to talk."

Before proceeding, the prosecutor stated that he was present at the hearing "in a capacity to assist" Complainant, to "answer any questions that the Board might have," and "maybe make a brief statement as well." Defense counsel responded, "I'm a little uncomfortable with that"; nevertheless, the hearing proceeded.

The victim counselor began by reading a letter written by Complainant. The letter was shorter in length than Complainant's victim impact statement, which the HPA had available at the first hearing, but focused more on the

---

[12] However, there is no indication in the record that the HPA foreclosed anyone from appearing or being heard at the first hearing.

underlying incident and the effect it had, and continued to have, on Complainant's life.

Next, Aunt was given the opportunity to make a statement. Aunt stated that Petitioner's "actions clearly show a lack of remorse." She also alluded to certain statements that Petitioner had allegedly made to a cellmate after he was sentenced. Defense counsel objected, "I don't know if she's allowed to make this statement. Where is this coming from? I object to this kind of stuff. Confessions from cellmates? What is that?" Aunt continued to attempt to explain that she included this information in her letter and that the cellmate was "a person who worked with [Complainant] who did weekends for DUI." Aunt argued, "[Petitioner] knew this and [Petitioner] found a way to get uncomfortable statements back to [Complainant]. And that's what he did by saying that, you know, his attorney is tight with the parole board and lucky he --" At that point, Aunt was again interrupted by defense counsel, whose statement was partially marked as "inaudible."

Aunt also addressed the HPA's initial minimum term: "This defendant clearly believes that he is above the law. Please make it clear to him that he cannot do what he did to [Complainant] and walk out of jail in 1.6 months, although that is even more time than he thought he would do." Aunt concluded, "Please don't let this heinous crime get a slap on the hand. A

1.6 minimum is a slap on the hand for [Petitioner] and a slap in the face for [Complainant]."

When the prosecutor began his statement, he referenced the circuit court judge's comments during Petitioner's sentencing and stated that he knew the judge.[13]  Defense counsel interrupted, objecting, "This is an improper argument.  You want to do something, you should get a transcript, or bring in (inaudible) the Deputy."  The prosecutor responded, "I have a transcript of the Judge."  Defense counsel again interjected, "This is an outrageous argument."

After Chairman Tufono told the prosecutor to continue, the prosecutor argued that Petitioner had "basically tricked" Complainant into meeting with him on the day of the incident.  Defense counsel objected, "This is unbelievable.  How does this come in?"  The prosecutor then referenced his nineteen years of experience as a prosecutor and stated that in his opinion the previously set minimum term "does not feel right" and "[i]t does not feel as though just punishment for this incident is . . . being meted out."  The prosecutor concluded by asking the HPA to "reconsider the previously set minimum."

Defense counsel then spoke, noting that the first hearing had lasted an hour and that the "worst of [Petitioner]

_____

[13]     The prosecutor stated, "I was present in the courtroom during the sentencing.  And the Judge's comments at the time of sentencing, absolutely astounding.  Because this was the individual -- and I'm talking about Judge Richard Bissen -- this is an individual who I have known for most of --"

came out" during that hearing. Defense counsel pointed out that the prosecutor's office sent the HPA a recommendation letter for the first hearing, and the HPA rejected the prosecutor's recommendation for the minimum term. He continued, "They just don't like the mandatory minimum." Defense counsel further expressed his frustration in regards to Aunt's statements, saying, "Then you talk about . . . some jail mate. I wish I could be over there. (Inaudible.) Shame on you," and "I wish I was there to ask you a few questions."

Following defense counsel's statement, Chairman Tufono asked Petitioner if he wanted to make a statement. Petitioner's response is denoted on the transcript as an "inaudible" "10-second statement." After defense counsel stated, "Can't hear," Petitioner made a longer statement also described as "inaudible." Chairman Tufono then twice stated to Petitioner that he had an opportunity to address Complainant. Petitioner made a statement that is marked as "inaudible" "40-second statement."

After Petitioner's comments, Chairman Tufono concluded the hearing and addressing defense counsel, stated, "[W]e're gonna go ahead and we'll take a look at this case. And if we need to reset the minimum, then that's what we'll do." Defense counsel responded, "I hope you won't reconsider this." Chairman Tufono only noted that the HPA would "let everybody know in a couple weeks what the decision is."

-11-

At no point during the hearing was Petitioner given an opportunity to speak privately with defense counsel.

On March 24, 2010, the HPA issued a second notice and order (Second Minimum Term Order), imposing a minimum term of five years imprisonment on each count, to expire on June 22, 2014.  The new minimum term was more than three times the initial term that had been set after the first hearing.  The order identified the level of punishment as "Level III," and "Nature of Offense" and "Degree of Injury to Person" as the significant factors used in determining the level of punishment.  The order did not reference the First Minimum Term Order.

Subsequently in July and August 2010, the HPA parole administrator responded to Petitioner's letters regarding the second hearing and increased minimum term.  The administrator informed Petitioner that the HPA had decided to "reopen your minimum term hearing to accept the victim's testimony."  Petitioner wrote two more letters to the HPA requesting an explanation for the Second Minimum Term Order.  On both occasions, the HPA responded that no action would be taken and that the parole board's "decision remains appropriate."

On February 10, 2011, Petitioner again wrote to the HPA, arguing that the HPA had exceeded its statutory authority in holding the second hearing and requesting that the HPA restore his original minimum term and hold an immediate hearing to

consider him for parole.  He informed the HPA that he had filed a HRPP Rule 40 petition with the circuit court.

The HPA administrator responded to Petitioner by letter dated February 22, 2011.  The letter stated that "[u]pon receipt of [Petitioner's February 10, 2011] letter, a review of your concerns, our records, and consultations with the Department of the Attorney General were conducted."  The administrator wrote that the HPA had acted appropriately, explaining that "victims . . . have the right to be present at minimum sentencing hearings and provide testimony . . . to the parole board."  The administrator then explained that the HPA had decided to "amend" the first minimum term as a result of the information provided by the prosecutor's office and the victims at the second hearing:

> In this case, <u>neither the Office of the Prosecuting Attorney nor the victims</u> . . . attended the minimum sentencing hearing held on October 12, 2009.  Therefore, the parole board appropriately allowed them to provide testimony and/or statements at the subsequent re-opened hearing held on March 19, 2010.  <u>As a result of the information provided by both</u>, the Office of the Prosecuting Attorney, and the victims at the March 19, 2010 hearing, <u>the parole board amended their [sic] previous decision of October 12, 2009</u>.

(Emphases added).

The administrator wrote that "the actions of the parole board in this matter do not violate your rights and/or any statutory authority.  In fact, the actions of the parole board were appropriate and ensured that the parties involved were provided the opportunity to exercise their right to be present and to be heard."

-13-

C.

Petitioner filed his HRPP Rule 40 petition for post-conviction relief on December 27, 2010, representing himself *pro se*. Petitioner argued that the HPA had violated his constitutional rights to due process and equal protection based upon the following claims: (1) the HPA exceeded its statutory authority by holding a second hearing to allow Complainant to testify after Petitioner had already been imprisoned for six months, and by subsequently increasing his minimum term from eighteen months to five years; (2) the HPA acted arbitrarily in sentencing Petitioner to a Level III punishment rather than a Level I punishment under the HPA Guidelines, despite the fact that he had no prior criminal history. Petitioner argued that it was arbitrary and capricious for the HPA to reopen his minimum term hearing to accept Complainant's testimony and that he should not be penalized for any miscommunication between the prosecutor's office and Complainant.

The State filed an answer to the petition on March 17, 2011. Although the State argued that Petitioner and his counsel appeared at the second hearing "after receiving proper notice," the nature of the "proper notice" was not identified or described.

Petitioner filed a reply to the answer on April 4, 2011.

On May 3, 2011, the circuit court granted Petitioner's motion to add a new ground of ineffective assistance of counsel to his petition (Amended Petition). As part of his ineffective assistance of counsel claim, Petitioner explained that defense counsel participated in the second hearing via HPA member Dane Oda's cell phone, which was placed on speaker phone. Petitioner argued that defense counsel's participation by telephone was insufficient, that counsel was absent during a "critical stage" of the criminal proceeding, and that prejudice was therefore presumed.

The State filed a response to the ineffective assistance of counsel claim on July 20, 2011 (State's Response to Amended Petition). The State argued that Petitioner was not denied effective assistance of counsel at the second hearing because counsel appeared via telephone and "ensure[d] that the minimum sentence imposed by the HPA [was] not predicated on misinformation or misreading of court records." (Quotation marks omitted).

The State attached as exhibits to its response, a copy of Aunt's December 15, 2009 letter to the HPA with enclosures (Exhibit "D"), a copy of the HPA's January 20, 2010 letter to Aunt (Exhibit "E"), and a copy of Aunt's March 10, 2010 written testimony for the second hearing, with enclosures (Exhibit "F"). Exhibits E and F reflected that the prosecutor's office received

those documents on July 12, 2011, eight days prior to the filing of the State's Response to Amended Petition.

On July 28, 2011, eight days after the State's Response to Amended Petition was filed, the circuit court issued its findings of fact, conclusions of law, and an order denying Petitioner's petition.

The court's conclusions of law provided in relevant part:

> 26.    Nothing in the record indicates Petitioner's rights to "reasonable notice of the hearing", "to be heard by the authority", and to consult with and enjoy the representation of counsel for the minimum term hearing were violated by the HPA.  See HRS § 706-669(3).  Petitioner was represented by [defense counsel], who was physically present at the first hearing, and represented Petitioner in the second hearing via telephone conference.

In regard to Petitioner's claim of ineffective assistance of counsel, the circuit court concluded that the claim was "patently frivolous."  The court concluded that counsel's appearance by phone was sufficient and did not demonstrate "the withdrawal or substantial impairment of a potentially meritorious defense":

> 46. To accuse [counsel] of being merely "unprepared" is not sufficiently specific for establishing a claim of ineffective assistance of counsel.  The only specific acts or omissions to which Petitioner does point, [counsel's] appearance by phone and not having a conference prior to the commencement of the hearing, do not demonstrate [counsel] lacked skill, judgment, or diligence, as to result in the withdrawal or substantial impairment of a potentially meritorious defense, or any other argument that should have been presented to the HPA.  Further, [counsel] made numerous objections to testimonies submitted by the victim's family, the victim counselor, and prosecutor[.]

(Quotation marks, brackets, and citations omitted) (Emphasis added).

-16-

The court concluded that "the facts alleged in the Petition, even when taken as true, do not entitle Petitioner to relief under HRPP Rule 40." The court denied an evidentiary hearing on the grounds that the claims submitted by Petitioner were "patently frivolous" and "without [a] trace of support either in the record or from other evidence submitted by the petitioner."

On August 1, 2011, Petitioner, apparently unaware of the court's order dismissing the petition, filed a reply to the State's Response to Amended Petition.

II.

On August 8, 2011, Petitioner filed a Notice of Appeal from the court's order denying his Rule 40 petition.

Petitioner argued before the ICA that the circuit court erred in denying his petition "prematurely" without reviewing his reply to the State's Response to Amended Petition. Petitioner also argued that the circuit court violated his due process rights by failing to hold an evidentiary hearing to determine whether the HPA exceeded its authority by holding the second hearing and whether his counsel was ineffective in attending the hearing via telephone.

On the issue of ineffective assistance of counsel, Petitioner claimed that at the second hearing, he "asked where his attorney was at and that he wanted to review all records before beginning." Petitioner cited Van Patten v. Deppisch, 434

-17-

F.3d 1038 (7th Cir. 2006), in support of his argument that counsel's participation via speaker phone was ineffective and also amounted to a denial of the assistance of counsel. Petitioner contended that the HPA hearing should have been continued or at a minimum, Petitioner should have been asked if he wished to continue without counsel present.

Petitioner also contended that the HPA violated his rights by withholding certain evidence from him prior to the second hearing.[14] Specifically, Petitioner claimed that he had not received the letters attached as Exhibits D, E, and F to the State's Response to Amended Petition.[15] According to Petitioner, he saw the letters for the first time when they were attached to the State's Response.

The State filed its answering brief on January 30, 2012.[16]

On Petitioner's first point, the State argued that the HRPP does not provide for the filing of a reply to an answer to a Rule 40 petition.

In response to Petitioner's second point, the State

---

[14]     Petitioner's remaining points of error on appeal before the ICA are not pertinent to the resolution of this Application and will not be addressed.

[15]     Petitioner also stated that he was unaware of the prosecutor's letter to the HPA on November 23, 2009, attached as Exhibit "C," but a notation on the letter indicated that a copy was sent to defense counsel.

[16]     On November 3, 2011, the Department of the Attorney General of the State of Hawaiʻi filed a Notice of Intent Not to File Answering Brief, which explained that the Department of the Prosecuting Attorney for the County of Maui would respond on behalf of the State as to all claims.

argued that the HPA did not abuse its discretion in holding a second minimum term hearing because the HPA has "broad discretion in establishing minimum terms" and Complainant had a right to be heard under HRS § 706-669(7).  The State acknowledged that HRS § 706-669 "does not specifically . . . allow[] for a second hearing after a minimum term is set, other than for a reduction" of the minimum term.  Nevertheless, the State argued that "there is no provision specifically prohibiting what happened in this case," and that "[g]iven the facts of this case, the HPA did the right thing in . . . allowing the victim to participate."  The State concluded that Petitioner therefore did not raise a "colorable claim."

The State further argued that Petitioner's due process rights were not violated by the HPA's holding of the second minimum term hearing, as Petitioner was given the opportunity to provide input at the hearing, and was assisted by counsel via speaker phone.  The State also argued that the HPA "gave proper notice [of the second hearing] to the parties."  However, the State did not provide a citation to the record on appeal for such notice and did not describe the nature, type or content of the notice given.  The State concluded that "there was no due process violation amounting to a colorable claim."

On Petitioner's ineffective assistance of counsel claim, the State argued that counsel was able to sufficiently represent Petitioner by participating in the second hearing via

speaker phone.  The State distinguished this case from the situation in D'Ambrosio v. State, 112 Hawai'i 446, 146 P.3d 606 (App. 2006), where counsel failed to appear before the HPA, "personally or otherwise."  The State maintained that in this case, counsel "ably represented" Petitioner by appearing by speaker phone, as evidenced by counsel's numerous objections during the hearing.

The State did not address Petitioner's third argument that the HPA wrongfully withheld evidence from him prior to the second hearing, including the letters attached as Exhibits D-F to the State's Response to Amended Petition.

Petitioner filed a reply to the State's answer. Petitioner responded that the legislature had not set out a procedure under HRS § 706-669 for increasing a minimum term sentence and that the HPA was obligated to abide by the procedural protections afforded to inmates.  Petitioner also argued that the victim's input and presence were not "essential element[s]" for the HPA to set a minimum term under HRS § 706-669.

In regard to Petitioner's ineffective assistance of counsel claim, he argued that "the HPA did not give the Petitioner the opportunity to speak privately with his attorney over the phone as Petitioner wanted to discuss various important matters pertaining to his defense."

The ICA affirmed the circuit court's order dismissing the Rule 40 petition, concluding that "[Petitioner's] arguments regarding the [HPA's] fixing of his minimum term after the second hearing were patently frivolous and without merit."[17] De La Garza v. State, No. CAAP-11-0000595 (App. Jul. 20, 2012) (SDO) at 2. The ICA reasoned that the "[Complainant] was not given notice of the first hearing and, therefore, was not afforded the opportunity to appear at the first hearing and present a written statement or oral comments, in violation of [HRS] § 706-669(7) (Supp. 2011)." De La Garza, SDO at 2.

The ICA further held that the circuit court did not err in concluding that Petitioner failed to raise a colorable claim of ineffective assistance of counsel. Id. at 3-4. The ICA determined that Petitioner failed to cite and it could not find any authority for the proposition that "an inmate's counsel may not appear by telephone at a minimum term hearing." Id. The court held that Petitioner "fail[ed] to argue how counsel's appearance by phone, per se, constituted a specific error or omission reflecting his lack of skill, judgment, or diligence, or the withdrawal or substantial impairment of a potentially meritorious defense." Id. at 4 (quotation marks omitted).

---

[17]    The Honorable Daniel R. Foley, the Honorable Katherine G. Leonard, and the Honorable Lawrence M. Reifurth, presiding.

The ICA concluded that "[Petitioner] waived his remaining arguments by failing to raise them in the Petition or [Amended Petition]." Id. (citing HRPP Rule 40(a)(3)).

III.

On September 10, 2012, Petitioner timely filed an application for writ of certiorari (Application) with this court. Petitioner maintains on this appeal that the ICA erred by 1) denying his claim that the HPA violated his rights by holding the second hearing to accept Complainant's testimony; and 2) holding that he waived his claim that the HPA withheld evidence prior to and during the second hearing because he did not raise the issue in his Rule 40 petition.[18]

IV.

A "HRPP Rule 40 petition is an appropriate means to challenge a minimum term of imprisonment set by the HPA." Coulter v. State, 116 Hawaiʻi 181, 184, 172 P.3d 493, 496 (2007). "The disposition of an HRPP Rule 40 petition is based on [findings of fact] and [conclusions of law]." Raines v. State, 79 Hawaiʻi 219, 222, 900 P.2d 1286, 1289 (1995). "Accordingly, we review the circuit court's conclusions of law de novo and findings of fact for clear error." Coulter, 116 Hawaiʻi at 184, 172 P.3d at 496.

---

[18] The remaining questions presented in Petitioner's Application will not be addressed in light of our disposition of the Application.

-22-

"[J]udicial intervention is appropriate where the HPA has . . . acted arbitrarily and capriciously so as to give rise to a due process violation, or otherwise violated the prisoner's constitutional rights."  Id. (quotation marks omitted).

V.

Petitioner argues that the ICA erred by holding that he waived his claim that the HPA violated his right to due process by withholding evidence from him prior to the second hearing. Petitioner argued before the ICA that he did not receive a copy of the three letters sent between Aunt and the HPA prior to the second hearing, and that he was not aware of these documents until they were attached as Exhibits D-F to the State's Response to Amended Petition.  The ICA held that this issue was among the arguments Petitioner "waived . . . by failing to raise them in the Petition or [Amended Petition]."  De La Garza, SDO at 4.

A.

Article I, section 5 of the Hawaiʻi Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty or property without due process of law[.]" Procedural due process claims are addressed in two steps: "First, we must determine whether a 'liberty' or 'property' interest has been interfered with by the State; second, we must determine what specific procedures are required to satisfy due process."  State v. Bani, 97 Hawaiʻi 285, 293, 36 P.3d 1255, 1263 (2001).

1.

The HPA is responsible for "fixing the minimum term of imprisonment to be served before the prisoner shall become eligible for parole" based on the minimum term hearing. HRS § 706-669(1). The HPA minimum term hearing is "a critical stage of the criminal proceeding" that "undoubtedly affects [the convicted] person's substantial rights." D'Ambrosio v. State, 112 Hawaiʻi 446, 464-66, 146 P.3d 606, 624-26 (App. 2006) (internal quotation marks and citations omitted). This court has held that due process protections apply to the HPA's determination of the minimum term.

> [T]he determination of a prisoner's minimum term is part of the parole process. Therefore, the same standards should apply to judicial review of both an HPA decision denying parole and an HPA decision establishing a minimum term. In both cases, judicial intervention is appropriate where the HPA has failed to exercise any discretion at all, acted arbitrarily and capriciously so as to give rise to a due process violation, or otherwise violated the prisoner's constitutional rights.

Williamson v. Hawaiʻi Paroling Auth., 97 Hawaiʻi 183, 195, 35 P.3d 210, 222 (2001) (footnote omitted) (emphases added). Therefore, the HPA was obligated to comply with the due process clause of the Hawaiʻi Constitution in determining Petitioner's minimum term of imprisonment.

2.

"Once it is determined that due process applies, the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Hawaiʻi courts have "repeatedly recognized

-24-

that due process is not a fixed concept requiring a specific procedural course in every situation. Instead, due process is flexible and calls for such procedural protections as the particular situation demands." Bani, 97 Hawaiʻi at 296, 36 P.3d at 1266 (internal quotation marks, brackets and citations omitted). However, "[a]t its core, procedural due process of law requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner before governmental deprivation of a significant liberty interest." Id. at 293, 36 P.3d at 1263.

In Morrissey v. Brewer, the U.S. Supreme Court determined that in the context of parole revocation, the minimum requirements of due process include "written notice of the claimed violations of parole," as well as "disclosure to the parolee of [the] evidence against him" and "a written statement by the factfinders as to the evidence relied on and reasons for revoking parole." 408 U.S. at 488-89 (emphasis added).

Specifically in the context of minimum term hearings, the Utah Supreme Court has held that due process "requires that the inmate know what information the [Parole] Board will be considering at the [original parole grant] hearing and that the inmate know soon enough in advance to have a reasonable opportunity to prepare responses and rebuttal of inaccuracies." Labrum v. Utah State Bd. of Pardons, 870 P.2d 902, 909 (Utah

1993).[19]  In Labrum, the parole board did not disclose to the
petitioner any of the adverse materials and information it would
be considering at the hearing.  Id. at 904.  These materials
included letters from the victim's family and "other information
Labrum and his counsel believed would have been helpful in
preparing rebuttal to the allegations against him."  Id.  Based
on this nondisclosure of information, the court granted the
petitioner's petition for an extraordinary writ directing the
board to disclose the board's file on the petitioner, vacate its
determination of his release date, and rehear his parole request.
Id. at 903, 914.

In reaching its decision, the Labrum court emphasized
the importance of the minimum term hearing, explaining that "an

---

[19]    Utah, like Hawaiʻi, has in place an indeterminate sentencing
scheme in which the Board of Pardons determines at the "original parole grant
hearing" the actual term that the inmate will serve in prison.  Labrum, 870
P.2d at 906-09.  The trial judge imposes the statutorily prescribed range of
time of imprisonment and the Board of Pardons "determines the actual number of
years a defendant is to serve."  Foote v. Utah Bd. of Pardons, 808 P.2d 734,
735 (Utah 1991).  The Board of Pardons has adopted sentence and release
guidelines that are "widely used . . . to estimate the time a particular
defendant should be imprisoned based on the circumstances of the case."
Labrum, 870 P.2d at 907.
        The Utah statute that refers to "original parole grant hearings"
is substantially similar to HRS § 706-669(1), and provides:

> The Board of Pardons and Parole shall determine within six
> months after the date of an offender's commitment to the
> custody of the Department of Corrections, for serving a
> sentence upon conviction of a felony or class A misdemeanor
> offense, a date upon which the offender shall be afforded a
> hearing to establish a date of release or a date for a
> rehearing, and shall promptly notify the offender of the
> date.

UTAH CODE ANN. § 77-27-7(1).  After the board makes its initial determination of
the actual term of imprisonment the inmate is to serve, the "Board retains the
flexibility to reassess its original decision" based on factors such as the
inmate's behavior in prison.  Labrum, 870 P.2d at 908-09.

inmate has a reasonable expectation that the term decided upon at the . . . hearing will turn out in fact to be his or her actual prison term," or "[a]t the very least, [that] it will operate as a benchmark to assess future status." Id. at 909. The court reasoned that the timely disclosure of information to the inmate relates to "fundamental fairness" and has the effect of "minimizing error and preserving the integrity of the process itself." Id. In addition, "[a]ccurate sentencing and parole decisions . . . further society's interest in ensuring that offenders will be returned to society neither sooner nor later than is appropriate." Id. at 910 (quoting Note, A Proposal to Ensure Accuracy in Presentence Investigation Reports, 91 YALE L.J. 1225, 1241-42 (1982)) (quotation marks omitted).

The Washington Supreme Court has also held that "at the setting of minimum terms, minimum due process requires that an inmate be advised of adverse information in his or her parole file." In re Sinka, 599 P.2d 1275, 1281-82 (Wash. 1979) (en banc). The court was primarily concerned with the possibility that the Parole Board would rely on inaccurate or erroneous information in the inmate's file that the inmate did not have an opportunity to correct. Id. The court reasoned that because "the data on which the Board acts is not developed through an open adversary confrontation, its accuracy cannot be assured unless the prisoner has access to the relevant information in his file," and "[b]oth the inmate and the state have an interest in

ensuring that the setting of minimum terms is based on accurate information and informed discretion."[20]  Id. at 1281 (quotation marks omitted).

Hawai&#x02BB;i cases related to sentencing, probation and minimum term hearings also reflect a concern that decisions are predicated on accurate factual information of which the defendant has adequate notice.

In the context of probation revocation, this court has held that "the minimum requirements of due process . . . require in relevant part that a probationer be given written notice of the claimed violations of probation, disclosure of evidence against him, and a written statement by the factfinder as to the evidence relied on and the reasons for revoking probation." State v. Durham, 125 Hawai&#x02BB;i 114, 126, 254 P.3d 425, 437 (2011) (quotation marks, brackets, ellipses and citations omitted).  The Durham court explained that "[t]he disclosure of facts to the

---

[20]    The Sinka court considered the parole board's procedures for setting minimum terms pursuant to WASH. REV. CODE (RCW) Chapter 9.95. 599 P.2d at 1277.

Subsequently, the Washington legislature adopted the Sentencing Reform Act of 1981 (SRA), codified in RCW Chapter 9.94A, "which replaced Washington's former indeterminate sentencing regime with determinate sentencing."  State v. Clarke, 134 P.3d 188, 191 (Wash. 2006) (en banc).

The SRA redesignated the Board of Prison Terms and Paroles as the Indeterminate Sentence Review Board (ISRB).  RCW 9.95.001.  The ISRB continues to have jurisdiction over "persons convicted of crimes committed prior to July 1, 1984."  RCW 9.95.009(2).  The ISRB is, however, required to "make decisions reasonably consistent with" the SRA's "purposes, standards, and sentencing ranges" and "the minimum term recommendations of the sentencing judge and prosecuting attorney."  Id.

In In re Whitesel, the Washington Supreme Court held that the due process requirements established in Sinka "also apply when the [ISRB] sets and redetermines minimum terms."  763 P.2d 199, 203-04 (Wash. 1988) (en banc) (footnote omitted).

parties is based on the proposition that the court must have correct information to render a just sentence." Id. at 124, 254 P.3d at 435. "In any system which vests discretion in the sentencing authority, it is necessary that the authority have sufficient and accurate information so that it may rationally exercise its discretion." Id. (quoting State v. Lau, 73 Haw. 259, 262, 831 P.2d 523, 525 (1992)) (quotation marks omitted).

Similarly, the court explained that the requirement that the defendant be given "notice of the grounds upon which probation is sought to be revoked" is intended to give the defendant an "opportunity to object, rebut, or otherwise dispute the factual allegations." Id. at 124-25, 254 P.3d at 435-36. See State v. Wong, 73 Haw. 81, 829 P.2d 1325 (1992) (holding that defendant was statutorily entitled to be informed of grounds for court's revocation of probation under HRS § 706-625(b), vacating order revoking probation and remanding "for rehearing upon the State's providing proper notice").

In State v. Paaaina, 67 Haw. 408, 410, 689 P.2d 754, 757 (1984), although the court held that a defendant does not have a constitutional or statutory right to examine a probation officer's sentencing recommendation, the court concluded that the defendant is entitled to "have access to all factual information used in sentencing." Thus, the court held that "it is incumbent upon the probation officer to carefully draft the recommendation

letter" so that it is "based only on facts contained in the pre-sentence report." Id. (citing HRS §§ 706-602 and 706-604). "If the judge finds new factual information in the recommendation letter, it is incumbent upon the judge to make it available to the defendant." Id. (emphasis added).

This underlying concern for predicating sentencing decisions on accurate information was also present in D'Ambrosio v. State, 112 Hawaiʻi 446, 466, 146 P.3d 606, 626 (App. 2006), in which the court recognized that "the HPA minimum-term hearing is a critical stage of the criminal proceeding" at which a convicted person is constitutionally entitled to be represented by counsel. In so concluding, the court considered the critical nature of the minimum term hearing and the "significant discretionary power" exercised by the HPA in setting the minimum term of imprisonment. Id. at 464-66, 146 P.3d at 624-26. The court explained that under the statutory scheme, "it is the HPA, not the courts, that exercises most of the State's felony sentencing discretion." Id. at 464, 146 P.3d at 624. The court indicated that the significance of counsel's presence at the minimum term hearing was based on the same concern for accuracy expressed in Durham and Paaaina: "a convicted person is constitutionally entitled to be represented at the hearing by counsel who can ensure that the minimum sentence imposed by the HPA is not predicated on misinformation or misreading of court records, which is a

requirement of fair play." Id. (quotation marks omitted) (emphasis added).

The considerations articulated by the D'Ambrosio court demonstrate the need for the convicted person to have access to all of the information considered by the HPA in making the critical "first determination of the actual term the inmate is to serve in prison." Labrum v. Utah State Bd. of Pardons, 870 P.2d 902, 908 (Utah 1993). As recognized in D'Ambrosio, the HPA makes this determination by considering a wide variety of circumstances, as set forth in the HPA Guidelines. The HPA is also statutorily required to "obtain a complete report regarding the prisoner's life before entering the institution and a full report of the prisoner's progress in the institution" prior to holding the minimum term hearing. HRS § 706-669(2). Without access to the potentially wide range of information being considered by the HPA, the convicted person may be unable to prepare a response and rebuttal to any adverse information being considered. In addition, the convicted person may be unable to correct any errors contained in the "complete report" obtained by the HPA. Thus, nondisclosure of such information may infringe on the convicted person's due process right to fairness and a meaningful opportunity to be heard.

In light of the critical nature of the HPA's determination of the prisoner's minimum term of imprisonment, due

process under Article I, section 5 of the Hawaiʻi Constitution requires that the prisoner have timely access to all of the adverse information contained in the HPA file.  The HPA must disclose such information "soon enough in advance" that the inmate has a "reasonable opportunity to prepare responses and rebuttal of inaccuracies."  Labrum, 870 P.2d at 909.  In the event that the HPA file of the inmate includes sensitive, or confidential personal information, the inmate is entitled to disclosure of a reasonable summary thereof.[21]

Such disclosure ensures that the HPA will set the inmate's minimum term of imprisonment based on accurate information and that the inmate is given reasonable notice and a meaningful opportunity to be heard on the issue of the minimum term.  See HRS § 706-669(3).

In this case, the record indicates that Petitioner did not receive the evidence in the HPA file prior to the second hearing.  The copies of the letters attached as Exhibits D-F to the State's Response to Amended Petition did not contain notations indicating that Petitioner, defense counsel, or the State received copies.  The time stamps on the HPA's January 20, 2010 letter to Aunt (Exhibit E) and Aunt's March 10, 2010 letter to the HPA (Exhibit F) indicated that the prosecutor's office did

_____

[21]    Where the relevant case file contains sensitive, or confidential personal information, the HPA may in its discretion take "suitable steps to withhold the identity of sources and prepare summaries of the information for the inmate's use rather than providing copies of the actual documents."  Labrum, 870 P.2d at 910.

not receive the documents until July 12, 2011, eight days prior to the filing of the State's Response to Amended Petition. In addition, the State did not claim in its Rule 40 pleadings or its answering brief to the ICA, that Petitioner or defense counsel had received copies of the documents.

Furthermore, in Aunt's two letters to the HPA, Aunt requested that the HPA "reconsider" the eighteen month minimum sentence, and provided the HPA with a written statement of her anticipated testimony for the second hearing. The HPA specifically informed Aunt that her December 15, 2009 letter requesting a second hearing and the information provided therein had "been made a part of [Petitioner's] case file." However, there is no indication in the record that the HPA disclosed the contents of Petitioner's case file to Petitioner prior to the second hearing. Additionally, at the hearing, when Aunt spoke and alleged that Petitioner had made certain statements to a cellmate, defense counsel expressed surprise, stating, "Where is this coming from?" Aunt's response was, "I did put this in my letter." These facts suggest that Petitioner may not have been provided all of the information in his HPA file.

Despite Petitioner's factual and legal basis for asserting his due process claim, the ICA, citing HRPP Rule 40(a)(3), held that this issue was among the arguments Petitioner "waived . . . by failing to raise them in the Petition or

[Amended Petition]."  De La Garza, SDO at 4.  HRPP Rule 40(a)(3) provides that "Rule 40 proceedings shall not be available and relief thereunder shall not be granted where the issues sought to be raised . . . were waived."  The rule defines waiver as follows:

> Except for a claim of illegal sentence, an issue is waived if the petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted, or in a prior proceeding actually initiated under this rule, and the petitioner is unable to prove the existence of extraordinary circumstances to justify the petitioner's failure to raise the issue.

Id.  "There is a rebuttable presumption that a failure to appeal a ruling or to raise an issue is a knowing and understanding failure."  Id.

This court has held that a claim of ineffective assistance of counsel is not considered "waived" for the purposes of a HRPP Rule 40 petition if there was "no realistic opportunity" for the petitioner to raise the claim in the proceedings specified by the rule.  See Briones v. State, 74 Haw. 442, 459, 848 P.2d 966, 975 (1993) (petitioner unable to raise ineffective assistance of counsel issue on direct appeal where petitioner was represented by same counsel at trial and on direct appeal); Fragiao v. State, 95 Hawaiʻi 9, 16, 18 P.3d 871, 878 (2001) (finding no waiver of claim asserting trial counsel's conflict of interest where petitioner was unaware of conflict until new appellate counsel was appointed).

In this case, Petitioner would not have had any opportunity to raise the issue of the HPA's nondisclosure of evidence in "any other proceeding actually conducted," if he was not aware of the existence of the letters sent between Aunt and the HPA prior to the second hearing until they were filed with the State's Response to Amended Petition as Exhibits D-F.[22] Additionally, Petitioner did not have the opportunity to raise this claim "in a prior proceeding actually initiated under this rule," as Petitioner did not file a Rule 40 petition prior to the instant petition. Thus Petitioner presented facts sufficient to rebut the presumption that he knowingly and understandingly waived the issue, and the ICA erred in holding that the issue was waived on appeal.

"In the absence of sufficient evidence in the record on appeal, an appellate court should remand for the development of such a record." Briones, 74 Haw. at 466 n.17, 848 P.2d at 978

---

[22] Petitioner also had a very limited time within which to amend his petition after he became aware of the three letters. At the time of the Rule 40 proceedings, Petitioner was being held in custody at a facility in Arizona and he was representing himself pro se. The circuit court filed its findings of fact, conclusions of law and order denying the petition eight days after the State filed its Response to Amended Petition and prior to receiving Petitioner's reply.

HRPP Rule 40 currently does not contain a provision allowing the petitioner to file a reply to the respondent's answer. It is noted that Rule 28(d) (2010) of the Hawai'i Rules of Appellate Procedure (HRAP) provides that an appellant may file a reply brief within fourteen days after service of the appellee's answering brief. HRAP Rule 40.1(e) (2012) also provides that within seven days after a response to an application for writ of certiorari is filed, any party may file and serve a reply.

Thus we suggest that the Standing Committee on Penal Rules may consider whether an amendment that allows for a reply to a HRPP Rule 40 answer would be appropriate.

n.17 (citation omitted). See D'Ambrosio v. State, 112 Hawai'i 446, 466, 146 P.3d 606, 626 (App. 2006) (concluding that colorable claim of denial of the right to counsel was presented and remanding for evidentiary hearing where appellate court was unable to confirm petitioner's claims due to lack of relevant record and transcripts). Thus, we remand for a Rule 40 evidentiary hearing in which the court is directed to address whether Petitioner's due process right to disclosure of adverse materials was violated by the HPA.

VI.

In light of our decision to remand the case for an evidentiary hearing, we also address the significant question of whether Petitioner received adequate notice of the nature and purpose of the second hearing. As stated, due process requires notice and a meaningful opportunity to be heard. State v. Bani, 97 Hawai'i 285, 293, 36 P.3d 1255, 1263 (2001). See HRS § 706-669(3) (providing that inmates have the right to "reasonable notice of the [minimum term] hearing" and the opportunity to be heard on the issue of the minimum term to be served).

In this case, the record is unclear as to whether Petitioner received adequate notice of the nature and purpose of the second hearing. Following the HPA's decision to increase Petitioner's minimum term from eighteen months to five years, the HPA explained in its February 22, 2011 letter to Petitioner that

-36-

the second hearing was a "re-opened" hearing to permit the prosecutor, Complainant and her representative(s) to appear and give statements.  The HPA informed Petitioner that "[a]s a result of information provided by both[] the Office of the Prosecuting Attorney, and the victims at the March 19, 2010 hearing, the parole board amended their previous decision of October 12, 2009."  (Emphasis added).

However, the purpose of the second hearing was not clear prior to the hearing, as reflected in the statements of its participants.

The ambiguity concerning the purpose of the second hearing began with the prosecutor's November 23, 2009 letter to the HPA, which requested that the second hearing be held for the purpose of permitting Complainant and her family to appear and submit statements addressing Petitioner.  The prosecutor did not suggest that Petitioner's minimum term should be reconsidered or amended on the basis that Complainant and her family did not appear or submit statements for the first hearing due to the "error in communication" with the prosecutor's office.  To the contrary, the prosecutor acknowledged that the minimum term had already been set.

In Aunt's December 15, 2009 letter to the HPA, however, Aunt acknowledged that the minimum term had been set but requested that the HPA "reconsider" the minimum term and

specifically requested that the "reconsidered" minimum term be "at least 3.4 years." The HPA initially indicated that the first minimum term would not be reconsidered, as the HPA responded to Aunt by assuring her that the minimum sentence did not mean that Petitioner would be paroled at that time and informing her that she could resubmit a letter for consideration prior to Petitioner's parole hearing.

Even as the second hearing commenced, it was unclear whether the second hearing was anything other than a procedural step to permit Complainant to appear and give testimony. Chairman Tufono opened the second hearing by explaining that it had been convened in order to give Complainant and Aunt an opportunity to be heard. Defense counsel agreed with this characterization, stating, "We went through all of their statements and all the reports and everything else, but, I mean, I'm sure they have a right to talk."

However, as the hearing developed, the primary focus of the hearing became assessing the "fairness" of the initial minimum term. When Aunt testified, she asked the HPA to "[p]lease make it clear to [Petitioner] that he cannot do what he did to [Complainant] and walk out of jail in 1.6 months, although that is even more time than he thought he would do."

The prosecutor also made a statement attacking the initial minimum term, arguing that based on his "19 years" of

experience as a prosecutor, Petitioner's minimum term "does not feel right" and "does not feel as though just punishment . . . is being meted out."  The prosecutor concluded by asking the HPA to "reconsider the previously set minimum in this case."  This approach appears to have been a significant departure from the prosecutor's November 23, 2009 letter to the HPA, which had focused on Complainant and her family's desire to appear before the HPA and did not suggest that the prosecutor's office was dissatisfied with either its participation in the first hearing or with the First Minimum Term Order.

Thus when the prosecutor stated at the beginning of the second hearing that he was present "in a capacity to assist" Complainant and to answer any of the HPA's questions, defense counsel commented that he was "uncomfortable" with that.  Later when the prosecutor gave his statement, defense counsel expressed surprise and frustration at the prosecutor's comments, interjecting, "This is an outrageous argument," and "This is unbelievable.  How does this come in?"

Additionally, the ambiguity regarding the purpose of the second minimum term hearing could not have been resolved based on a consideration of the governing statute, HRS § 706-669.

The ICA held that "[t]he HPA did not err by holding the second hearing because the victim was not given notice of the first hearing and, therefore, was not afforded the opportunity to

appear at the first hearing and present a written statement or oral comments, in violation of [HRS] § 706-669(7)." De La Garza, SDO at 2 (emphasis added). This suggests that the first hearing and the HPA's First Minimum Term Order violated HRS § 706-669 as a result of the apparent lack of notice to Complainant regarding the first hearing. In addition, the ICA's holding implies that Petitioner and defense counsel had adequate notice, based on the statute, that the second hearing was being held for the purpose of re-opening and amending Petitioner's initial minimum term.

First, as the State concedes, HRS § 706-669 does not expressly provide for the HPA to subsequently increase a minimum term fixed by its order.[23] Thus, Petitioner would not have had notice of the nature or purpose of the second hearing under the express terms of the statute.

Second, while HRS § 706-669(7) (Supp. 2010) provides that "[t]he [minimum term] hearing shall be opened to victims or their designees or surviving immediate family members who may present a written statement or make oral comments,"[24] the statute does not provide that the victim's non-appearance or lack of

---

[23]    HRS § 706-669(5) (Supp. 2010) only provides that "[a]fter sixty days notice to the prosecuting attorney, the authority in its discretion may reduce the minimum term fixed by its order pursuant to subsection (1)." (Emphasis added).

[24]    The statute was amended in 1996 to provide for victims or their representatives to have the opportunity to comment at minimum term hearings. Supplemental Commentary on HRS § 706-669 (Supp. 2010). The amendment was intended to codify the HPA's existing practice of permitting victims or their representatives to speak at the hearings. Id.

testimony at a hearing has the effect of invalidating actions taken by the HPA pursuant to such hearing.[25]  Accordingly, the fact that Complainant was not present at Petitioner's first hearing due to an "error in communication" did not render the hearing or the resulting minimum term order a "violation" of HRS § 706-669(7).

Third, there is no indication that the first hearing was closed to Complainant or her representatives in a manner that would amount to a "violation" of HRS § 706-669(7).  Therefore, Petitioner and defense counsel had no reason to know, based on HRS § 706-669, that Petitioner's initial minimum term was subject to being re-opened and "amended" due to Complainant's apparent lack of notification of the first hearing.

Based on the record, a question arises as to whether Petitioner received sufficient notice of the purpose and nature of the second hearing.  As noted, there was a lack of clarity as to the purpose of the second hearing and its relationship to the first hearing.  Even on appellate review, it is unclear whether the second hearing should be characterized as an entirely new and separate hearing from the first hearing, a re-opened hearing, or a reconsideration of the first hearing.  Accordingly, the circuit

_____

[25]     Petitioner noted in his reply brief to the ICA that the "victim's input and/or presence is not an essential element for the HPA" to determine an inmate's minimum term pursuant to HRS § 706-669.  Otherwise, Petitioner argued, "the thousands of minimum term hearings held for defendants by the HPA without the input or presence [of] the victim" resulted in minimum term orders that are not "final judgments" and are open to challenge at any time.

court is also directed on remand to address the issue of whether Petitioner received adequate notice of the nature of the second hearing. See Briones v. State, 74 Haw. 442, 466 n.17, 848 P.2d 966, 978 n.17 (1993); D'Ambrosio v. State, 112 Hawaiʻi 446, 466, 146 P.3d 606, 626 (App. 2006).

VII.

As stated, the HPA minimum term hearing is a "critical stage of a criminal proceeding" at which "a convicted person is constitutionally entitled to be represented . . . by counsel[.]"[26] D'Ambrosio, 112 Hawaiʻi at 466, 146 P.3d at 626.

Petitioner maintained throughout the Rule 40 proceedings and his appeal to the ICA that his constitutional right to effective assistance of counsel and his right to counsel were violated by defense counsel's participation in the second hearing via telephone.[27] The ICA held that it was aware of no authority "stating that an inmate's counsel may not appear by telephone at a minimum term hearing" and affirmed the circuit court's denial of this claim. De La Garza, SDO at 3-4. In support of its determination, the ICA explained that defense

---

[26] In addition, HRS § 706-669(3)(b) provides that the inmate shall "be permitted to be represented and assisted by counsel at the hearing."

[27] In Hawaiʻi, in order to show ineffective assistance of counsel, the defendant has the burden of establishing "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." State v. Aplaca, 74 Haw. 54, 66-67, 837 P.2d 1298, 1305 (1992) (footnote omitted).

counsel "actively participated in the proceedings, including voicing numerous objections." Id. at 4.

However, active participation in the proceeding does not itself demonstrate that counsel was not prevented by the phone arrangement from providing the full benefit of counsel's skills. In Van Patten v. Deppisch, 434 F.3d 1038 (7th Cir. 2006), rev'd, 552 U.S. 120 (2008), the court articulated numerous reasons for its determination that defense counsel's participation in a plea hearing via speaker phone, in the circumstances of that case, "made it impossible for [the petitioner] to have the 'assistance of counsel' in anything but the most perfunctory sense."[28]  434 F.3d at 1043.  In particular, the court emphasized that because of the phone arrangement, "[u]nlike the usual defendant in a criminal case, [the defendant] could not turn to his lawyer for private legal advice, to clear up misunderstandings, to seek reassurance, or to discuss any last-minute misgivings."  Id.

In addition, the court noted that "[o]ver a phone line, it would be all too easy for a lawyer to miss something."  Id. at

---

[28]     The Seventh Circuit's decision to grant the petitioner's writ of habeas corpus was reversed by the Supreme Court, which found that the petitioner failed to establish that the state court unreasonably applied clearly established federal law by denying the petitioner's ineffective assistance of counsel claim pursuant to Strickland v. Washington, 446 U.S. 668 (1984).  Wright v. Van Patten, 552 U.S. 120, 125-26 (2008).  The Court explained, "Our precedents do not clearly hold that counsel's participation by speaker phone should be treated as a 'complete denial of counsel,' on par with total absence."  Id. at 125.  The Court expressly left its "consideration of the merits of telephone practice . . . for another day."  Id. at 126.

1045. For example, counsel's ability to represent the defendant would suffer from counsel's inability to "detect and respond to cues from his client's demeanor that might have indicated he did not understand certain aspects of the proceeding, or that he was changing his mind." Id. at 1043. Furthermore, the court was concerned that due to the phone arrangement, "[i]f [the petitioner] wished to converse with his attorney, anyone else in the courtroom could effectively eavesdrop." Id. The court noted that "[n]o advance arrangements had been made for a private line in a private place, and even if one could 'perhaps' have been provided, it would have required a special request by [the petitioner] and, apparently, a break in the proceedings." Id. The court thus concluded that "the arrangements under which the hearing was conducted, with defendant and counsel unable to see or communicate privately with each other," prevented the attorney "by . . . design . . . from providing the full benefit of his skills[.]" Id. at 1044.

Although we need not decide whether defense counsel's telephone participation in this case constituted a violation of Petitioner's right to counsel or right to effective assistance of counsel, as the issue was not raised in the Application, we note that many of the concerns articulated by the Van Patten court were also present in this case.

For instance, Petitioner was not asked whether he objected to counsel's participation by speaker phone or preferred to reschedule the hearing to another date. Petitioner was also not informed that he had the option of conferring privately with counsel during the hearing.

Furthermore, while Van Patten involved a plea hearing with no witnesses, in this case witnesses were present at the second minimum term hearing and the record indicates that counsel's representation of Petitioner may have been affected because of his phone participation. Petitioner was not given an opportunity to confer privately with counsel at any time during the proceedings. When Aunt made several accusations regarding Petitioner's post-sentencing conduct, it appeared that defense counsel was not expecting such accusations and considered the remarks to be serious allegations. Counsel interjected objections and twice stated that he wished he could be present at the hearing to question Aunt regarding the accusations. Despite the potentially damaging nature of Aunt's allegations of Petitioner's post-sentencing conduct, Petitioner and defense counsel were not given an opportunity to privately discuss how to respond to the allegations. In addition, Petitioner was not given an opportunity to consult privately with counsel about whether to address Complainant at the end of the hearing and to discuss the subject matter of his statement.

Moreover, the right to counsel includes the defendant's right to confer with counsel. State v. Mundon, 121 Hawaiʻi 339, 367, 219 P.3d 1126, 1154 (2009). In Mundon, the court held that "a criminal defendant has a constitutional right to confer with counsel at all stages of his case, including recesses taken during his testimony." Id. Accordingly, "preventing a defendant from conferring with his counsel during a recess of any length would . . . deny his right to assistance of counsel[.]"[29] Id. See also State v. Ulestad, 111 P.3d 276, 278-79 (Wash. Ct. App. 2005) ("defendant's right to continuously consult with his counsel during trial" was violated, where counsel was in adjoining room with child witness and defendant was not provided with method of constant communication with counsel).

Thus, while we need not address Petitioner's right to effective assistance of counsel or right to counsel claims in this case, nevertheless counsel's representation of a client by phone at a critical stage of the criminal proceeding should not prevent counsel from providing the full benefit of counsel's skills and guidance at a time when they may be most needed.

_____

[29] The Mundon court clarified that the defendant's right to confer with counsel applies "during a *routine* recess taken during trial proceedings, . . . except when a request for a non-routine recess for the purposes of conferring with counsel would, in the discretion of the trial court, interfere with the orderly and expeditious progress of the trial." Id. at 368, 219 P.3d at 1155 (italics in original) (footnote omitted). The dissenting opinion in Mundon would have held that the right to counsel applies during routine recesses, without inquiry into the "need" for attorney-client consultation and without conditioning such consultation upon the defendant's objection, request or concern. Id. at 372, 219 P.3d at 1159 (Acoba, J., dissenting).

VIII.

Based on the foregoing, we conclude that the circuit court erred in denying Petitioner's HRPP Rule 40 petition without an evidentiary hearing.  Accordingly, the ICA erred in affirming the circuit court's July 28, 2011 order denying the petition.  The August 23, 2012 judgment of the ICA and the circuit court's order are vacated and the case is remanded to the circuit court to conduct an evidentiary hearing consistent with this opinion.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Simeon R. Acoba, Jr.

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack