320 P.3d 889

**Erwin E. FAGARAGAN,**
**Petitioner/Petitioner–**
**Appellant,**

v.

**STATE of HAWAIʻI,**
**Respondent/Respondent–Appellee.**

**No. SCWC–11–0000592.**

Supreme Court of Hawaiʻi.

Feb. 14, 2014.

As Corrected March 21, 2014.

Erwin E. Fagaragan, pro se.

Lisa M. Itomura and Diane K. Taira, Honolulu, for respondent.

ACOBA, McKENNA, and POLLACK, JJ., with RECKTENWALD, C.J., Dissenting, with Whom NAKAYAMA, J., Joins.

Opinion of the Court by POLLACK, J.

Petitioner/Petitioner–Appellant Erwin E. Fagaragan (Fagaragan) seeks review the Intermediate Court of Appeals' (ICA) October 18, 2012 Judgment on Appeal (ICA Judgment) filed pursuant to its September 19, 2012 Summary Disposition Order (SDO), which affirmed the Circuit Court of the Second Circuit's (circuit court) July 18, 2011 Findings of Fact, Conclusions of Law, and Order Denying the Rule 40 Petition for Post–Conviction Relief (Order Denying Rule 40 Petition).

For the reasons set forth herein, we vacate the ICA Judgment, and remand the case to the circuit court to enter an order (1) vacating its Order Denying Rule 40 Petition, and (2) directing the Hawaii Paroling Authority to hold a new minimum term hearing under

Hawai'i Revised Statutes (HRS) 706–669 (1993 & Supp. 2006).

## I.

### A. Prior Underlying Criminal Proceedings and Appeals

#### 1. Cr. No. 04–1–0595(1)

In Cr. No. 04–1–0595(1), Fagaragan was convicted of unauthorized control of a propelled vehicle, HRS § 708–836 (Supp. 2003)[1] (Count I); promoting a dangerous drug in the first degree, HRS § 712–1241(1)(a)(i) (Supp. 2003)[2] (Count II); prohibited acts relating to drug paraphernalia, HRS § 329–43.5(a) (Supp. 2002)[3] (Count IV); and promoting a detrimental drug in the third degree, HRS § 712–1249(1) (Supp.2005)[4] (Count V). The charges stemmed from Fagaragan's arrest for driving a stolen vehicle and his possession of 33 grams of methamphetamine, marijuana, and paraphernalia. The circuit court sentenced him to twenty years imprisonment in Count II, five years imprisonment in Counts I and IV, and thirty days imprisonment in Count V, all terms to run concurrently to one another.

Fagaragan appealed the convictions. The ICA issued an SDO affirming the circuit court's judgment of conviction.

#### 2. Cr. No. 05–1–0090(1)

In Cr. No. 05–1–0090(1), Fagaragan was found guilty of promoting a dangerous drug in the first degree, HRS § 712–1241(1)(a)(i) (Count I); attempted promoting a dangerous drug in the first degree, HRS § 712–1241(1)(b)(ii)(A) (Supp. 2002)[5] (Count II); and prohibited acts relating to drug paraphernalia, HRS § 329–43.5(a) (Count III). The charges arose out of a traffic stop in which Fagaragan's vehicle was searched and two bags were recovered that contained 28 packets of methamphetamine totaling 5.46 ounces and paraphernalia. The circuit court sentenced Fagaragan to twenty years imprisonment in Counts I and II, and five years imprisonment in Count III, all terms to run concurrently with each other and concurrently with the prison terms imposed in Cr. No. 04–1–0595(1).

Fagaragan appealed the convictions. The ICA held that Fagaragan's convictions in Counts I and II constituted multiple punishments for the same conduct, as the attempt-

---

1. HRS § 708–836 (Supp. 2003) Unauthorized control of propelled vehicle provides in relevant part:

 (1) A person commits the offense of unauthorized control of a propelled vehicle if the person intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent or by changing the identity of the vehicle without the owner's consent.

2. HRS § 712–1241 (Supp.2005) Promoting a dangerous drug in the first degree provides in relevant part:

 (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
 (a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
 (i) One ounce or more, containing heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers;

3. HRS § 329–43.5 (Supp. 2002) Prohibited Acts Related to Drug Paraphernalia provides in relevant part:

 (a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter.

4. HRS § 712–1249 (1993) Promoting a Detrimental Drug in the Third Degree provides in relevant part:

 (1) A person commits the offense of promoting a detrimental drug in the third degree if the person knowingly possesses any marijuana or any Schedule V substance in any amount.

5. HRS § 712–1241(1)(b)(ii)(A) (Supp. 2002) provides in relevant part:

 (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
 . . . .
 (b) Distributes:
 . . . .
 (ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:
 (A) One-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

ed distribution offense was based solely on possession of the same contraband that formed the basis of the possession offense. *State v. Fagaragan,* 115 Hawai'i 364, 371, 167 P.3d 739, 746 (2007).

In order to remedy the "improper imposition of multiple punishments," the ICA reversed the conviction in Count II because the circuit court had failed to instruct the jury upon a requisite state of mind for an element of the attempted distribution offense in Count II. *Id.* at 371–72, 167 P.3d at 746–47. The ICA affirmed the convictions in Counts I and III. *Id.* at 372, 167 P.3d at 747.

### B. HPA's Minimum Term Hearings

On May 21, 2007, Fagaragan and his counsel appeared before the Hawaii Paroling Authority (HPA) for a consolidated hearing to set his minimum terms of imprisonment for Cr. No. 04–1–0595(1) and No. 05–1–0090(1). On the same day, the HPA issued its Notice and Order of Fixing Minimum Term(s) of Imprisonment (HPA Order 1), which included the offenses from *both* criminal numbers. The minimum terms ordered by the HPA were as follows:

| Crime Number | Count | Offense [6] | Maximum | Minimum |
|---|---|---|---|---|
| 04–1–595(1) | I | UCPV | 5 yrs | 5 yrs |
| 04–1–595(1) | II | PDD–1 | 20 yrs | 20 yrs |
| 04–1–595(1) | IV | Paraphernalia | 5 yrs | 5 yrs |
| 05–1–0090(1) | I | PDD–1 | 20 yrs | 20 yrs |
| 05–1–0090(1) | II | Att. PDD–1 | 20 yrs | 20 yrs |
| 05–1–0090(1) | III | Paraphernalia | 5 yrs | 5 yrs |
| 05–1–0090(1) | II | Att. PDD–1 | 20 yrs | 20 yrs |
| 05–1–0090(1) | III | Paraphernalia | 5 yrs | 5 yrs |

The HPA categorized Fagaragan as a Level III offender based on the criteria of "Nature of Offense." [7]

On April 23, 2008, following the reversal by the ICA of Fagaragan's conviction in Count II in Cr. No. 05–1–0090(1), the HPA held a second hearing to reset Fagaragan's minimum terms. The hearing only pertained to Fagaragan's convictions in the Cr. No. 05–1–0090(1) case. On April 26, 2008, the HPA issued a Notice and Order of Fixing Minimum Term(s) of Imprisonment (HPA Order 2) resetting Fagaragan's terms in Cr. No. 05–1–0090(1) to the identical terms that had previously been imposed:

| Crime Number | Count | Offense | Maximum | Minimum |
|---|---|---|---|---|
| 05–1–0090(1) | I | PDD–1 | 20 yrs | 20 yrs |
| 05–1–0090(1) | III | Paraphernalia | 5 yrs | 5 yrs |

The HPA continued to categorize Fagaragan as a Level III offender, despite the ICA's reversal of Fagaragan's conviction in Count II, again based on the sole criteria of "Nature of Offense."

A May 5, 2008 date-stamp on HPA Order 2 indicates that a copy was "served to the prisoner" by mail.

### C. Fagaragan's Rule 40 Petitions

#### 1. S.P.P. No. 08–1–0009(1): First Petition

On June 18, 2008, Fagaragan, pro se, filed a Petition For Post–Conviction Release Pursuant to Hawai'i Rules of Penal Procedure Rule 40 (2006) (First Petition), alleging five grounds as a basis for relief in connection with Cr. No. 05–1–0090(1).[8]

---

**6.** The abbreviations used by HPA are stated as follows: UCPV for "unauthorized control of a propelled vehicle"; PDD–1 for "promoting a dangerous drug in the first degree"; Paraphernalia for "prohibited acts related to drug paraphernalia"; and Att. PDD–1 for "attempted promoting dangerous drug in the first degree."

**7.** The HPA utilizes six criteria in determining the level of punishment for a Level III offender in any given case. The three primary criteria that generally receive the greatest weight include:

Nature of Offense, the Degree of Injury/Loss to Person or Property, and the Offender's Criminal History. The HPA Guidelines require the Order Establishing Minimum Terms of Imprisonment to include the significant criteria upon which the decision was based.

**8.** In his First Petition, Fagaragan alleged the following five grounds:

1. Illegal Search and Seizure conducted by officers without first obtaining a search war-

The Petition did not reference or challenge HPA Order 2, which had reset the minimum terms of imprisonment in Count I at 20 years and Count III at 5 years. Fagaragan's return address on the First Petition indicates he was incarcerated in Eloy, Arizona.

On June 25, 2008, the circuit court issued its Findings of Fact, Conclusions of Law, and Order Denying Post–Conviction Relief Pursuant to Hawai'i Rules of Penal Procedure Rule 40 (Order Denying First Petition). The circuit court concluded: the illegal search issue was previously raised before the trial court on a motion to suppress; the double jeopardy issue was raised on appeal (and Fagaragan prevailed on that point, making it moot); and every other issue Fagaragan raised in his Rule 40 petition could have been raised on appeal but was not, and was thus waived. The circuit court therefore denied the First Petition without a hearing.

Fagaragan appealed the Order Denying First Petition to the ICA. Fagaragan's arguments on appeal were largely identical to his arguments in his First Petition, with the exception of a newly raised claim for ineffective assistance of appellate counsel (IAC). The ICA held that because Fagaragan did not initially raise the ineffective assistance claim in the First Petition, the issue would be disregarded pursuant to Hawai'i Rules of Appellate Procedure (HRAP) 28(b)(4). *Fagaragan v. State*, No. 29281, 121 Hawai'i 178, 214 P.3d 1168 2009 WL 2608463, *1, *3 (App. Aug. 26, 2009) (SDO). With respect to the other issues raised, the ICA affirmed the Order Denying First Petition. *Id.* at *2–*3.

Fagaragan filed an application for writ of certiorari, which this court denied. *Fagaragan v. State*, No. 29281, 2010 WL 374737 (Haw. Jan. 20, 2010).

2. S.P.P. No. 11–1–0005(1): Second Petition

On May 11, 2011, Fagaragan, pro se, filed a Petition to Vacate, Set Aside, or Correct Judgment or to Release Petitioner for (sic) Custody (Second Petition) with respect to Cr. Nos. 04–1–0595 and 05–1–0090. The return address of the Second Petition indicates that Fagaragan was incarcerated in "CCA–Saguaro" Eloy, Arizona. In the Second Petition, Fagaragan contended that the HPA had violated the 5th, 6th, 8th, and 14th Amendments to the United States Constitution as well as the State of Hawai'i Constitution.

In response to question 11(e) of the Second Petition, "If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not," Fagaragan responded that he "thought that HPA would grant me a new hearing based that they violated others rights which the ICA and Supreme Court stated but they would not listen to them[.]"

In response to question 13 of the Second Petition, "If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them," Fagaragan answered that he "thought that HPA would correct their errors but did not even though the ICA–Su-

rant prior to entering the vehicle received into evidence. This illegal search of vehicle by K–9 Unit raises a Fourth Amendment violation protected by the United States Constitution.
2. Petitioner had been charged and convicted by a jury for the same alleged offense or offenses twice, thereby violating petitioner's Fifth Amendment right which protects an accused of being charged twice for the same offense.
3. In petitioner's first jury trial the State presented someone else[']s evidence to the court. The question presents itself, did the Maui Police Department mixed up the evidence held, and convicted petitioner on grounds of false evidence? An accused has to be found guilty beyond a reasonable doubt prior to this person receiving a guilty verdict. This is not the case herein, thereby the court stands in violation of

a Due Process violation which is guaranteed an accused under the Fourteenth Amendment to the Constitution.
4. Conviction of Attempted Promotion of Controlled Substance is over reaching and without merit in this case.
5. There was no foundation laid as to the proper working order of the instruments used by the Maui Police Department in the testing of alleged uncontrolled substance(s) which ultimately were used to convict petitioner herein.
6. The entire conviction herein is illegal, as petitioner had to be found guilty beyond a reasonable doubt, which has not been the case in this jury trial and said conviction must be remanded for the overturning of said sentence, and petitioner must be released from custody at once.

preme Court ordered that the prior sentences were illegal."

Fagaragan continued, "HPA should have corrected their erros [sic] violations without me submitting this but they continue to violate my rights."

In his Memorandum in Support of his Rule 40 petition, Fagaragan asserted that the HPA acted arbitrarily and capriciously in: (1) failing to follow their guidelines by not including the "Degree of Injury/Loss To Person or Property" and "Criminal History" criteria; (2) categorizing him as a Level III offender, in light of an absence of criminal history; and (3) subsequently setting his minimum term at 20 years, in violation of equal protection. Fagaragan argued that he should not have received Level III punishment as "no-one during trial testified that he sold or did any such act" of being involved in the "manufactor [sic], importation or distribution of drugs." Fagaragan attached both the First and Second HPA Order as exhibits to the Second Petition and contended that HPA "[a]rbitrarily and [c]apriciously" violated petitioner's rights not once, but twice." Fagaragan's requested relief was for the HPA to categorize him as a Level I or II offender and correctly reset a new minimum term.

On June 14, 2011, the State filed its Answer to Petition to Vacate, Set Aside, or Correct Judgment or to Release Petitioner From Custody (Response). The State argued that Fagaragan waived the issues presented in his Second Petition for failing to raise them in his First Petition. The State noted that Fagaragan had not submitted any evidence of "extraordinary circumstances to justify his failure to previously raise the issues."

In response to Fagaragan's claim that the HPA violated his procedural and substantive due process rights, the State argued that Fagaragan received all the process that he was due because the HPA held a fair hearing to reset his minimum term, and Fagaragan had no constitutional right to parole or a reduction of a minimum term of imprisonment and release from custody.

Moreover, the State argued that the HPA properly categorized Fagaragan as a Level III offender and had not acted "arbitrarily or capriciously so as to give rise to a due process violation." In support of its position, the State pointed out that: (1) Fagaragan's actions fit the significant criteria under Level III, "Nature of Offense," in the HPA Guidelines For Establishing Minimum Terms of Imprisonment, July 1989 (HPA Guidelines); (2) Fagaragan was previously convicted and sentenced under FC No. 02–1–0995; and (3) the HPA's findings indicated that Fagaragan fit the significant criteria of "Character and Attitude of Offender With Respect to Criminal Activity or Lifestyle;" and he "deserved the category of Level III."

Fagaragan filed a reply brief (Rule 40 Reply). As to the State's argument that he waived his claims, Fagaragan stated that HPA had not "corrected their errors prior to him filing his initial petition":

As to the States [sic] first argument as to why his petition should be denied is because he failed to properly argue this on his initial HRPP Rule 40 petition. However this is not so. HPA failed to correct their errors prior to him filing his initial petition. Had HPA fixed the problem in the first place he would not have argued this ... The Intermediate Court of Appeals and Supreme Court State of Hawai'i ordered HPA to correct their errors which they refuse to do.

(Emphasis added).

In addition, Fagaragan argued that he did not waive his challenge to his minimum term for having failed to raise the issue in the First Petition because the "grossly inadequate law library" did not have a copy of *Coulter v. State*, 116 Hawai'i 181, 172 P.3d 493 (2007), in the legal books or on LEXIS at the time Fagaragan filed his First Petition. Fagaragan also reiterated that he was a Level I (or II) offender because, contrary to what the State argued, the instant drug offenses were Fagaragan's "first ever criminal conviction," FC No. 02–1–0995 having been previously dismissed.

The circuit court, without holding a hearing, issued its Findings of Fact, Conclusions of Law, and Order denying Rule 40 Petition

for Post–Conviction Relief.[9] The circuit court concluded that Fagaragan waived his claims in the Second Petition for not including them in his First Petition, failed to "prove the existence of extraordinary circumstances to justify [his] failure to raise the issues previously," and therefore "failed to rebut the presumption and has waived the claims" in the Second Petition. Additionally, the court held that Fagaragan's allegations even if taken as true, do not entitle him to relief. Therefore, the circuit court concluded that Fagaragan failed to present a colorable claim, the claims were "patently frivolous," and were without support in the record. Fagaragan timely appealed.

### D. Intermediate Court of Appeals

#### 1. Opening Brief

Fagaragan raised, inter alia, the following points of error:

a.) Whether the courts erred in denying petitioner his Rule 40 without a hearing which he did have colorable grounds for relief.

b.) Whether HPA did violate petitioner's 5th, 6th, 8th and 14th Amendments to the U.S. Constitution when HPA failed to comply with their own statutorily required procedural requirements/guidelines when they failed to list all the special criteria's as mandated by HRS § 706–669(8).

c.) Whether HPA violated petitioner's 5th, 6th, 8th and 14th Amendments to the U.S. Constitution when they illegally assessed him as a Level III Offender which per guidelines he should have been assessed as a Level I or at the most Level II Offender due to this being his first ever conviction and imprisonment and due to his offenses not being classified as serious which no person received any type of injuries for crimes of drugs.[10]

In support of his first and second points of error, Fagaragan argued that he had a colorable claim for Rule 40 relief because he demonstrated that HPA utilized only one criteria ("Nature of Offense") in setting his minimum term rather than all three significant criteria, the other two criteria being "Criminal History" and "Character and Attitude of Offender With Respect to Criminal Activity or Lifestyle," in violation of *Coulter*, 116 Hawai'i 181, 172 P.3d 493 (2007). Further, Fagaragan argued that HPA should have utilized all six significant criteria when establishing his minimum term, and it did not.

In support of his third point of error, Fagaragan argued that he did not fit the criteria for categorization as a Level III Offender and was, at most, a Level I or II Offender. This was because, according to Fagaragan, as to the nature of the offense, his crimes were not "cruel and callous" or "against the elderly, handicap and or minor," and he "did not distribute or import or cultivate drugs[.]" As to the degree of injury and/or loss, Fagaragan asserted that he did not rape or murder or otherwise cause injury to anyone. As to his criminal history, Fagaragan argued he had "no prior convictions."

In conclusion, Fagaragan requested that the ICA "grant him his petition and order HPA to conduct a new hearing" before the HPA to have his minimum term reset as a Level I or II Offender.

#### 2. Answering Brief

In its Answering Brief, the State argued that Fagaragan waived the claims raised in his Second Petition by knowingly and understandingly not raising them in his First Petition without submitting any evidence of extraordinary circumstances to justify his failure to raise those claims. Specifically, the State argues that Fagaragan had "ample opportunity to raise any challenges to

9. The Honorable Rhonda I.L. Loo presided.

10. Fagaragan also presented two additional points of error:

d.) Whether HPA acted arbitrarily or capriciously when they failed to properly follow their guidelines thus violating his 5th, 6th, 8th, and 14th Amendments under the Equal Protection Clause which others had received lesser prison sentences which they were convicted of 4–5–6 times for the same offenses and this being petitioner's first ever conviction.

e.) Whether petitioner's claims warrents [sic] Habeas Relief which HPA and the courts violated his U.S. Constitutional rights under the 5th, 6th, 8th, and 14th Amendments.

his May 21, 2007 minimum term order or his April 23, 2008 minimum term order therein, but waited until the instant Petition, filed on May 11, 2011, to make his claims."

The State nonetheless went on to address the merits of Fagaragan's points of error. As to Fagaragan's first and second points of error (that the HPA was required to utilize three criteria or six significant criteria), the State countered that the case law Fagaragan cited did not support his argument that the HPA had to point to more than just the "Nature of Offense" significant criteria to justify its Level III categorization.

The State explained that *Hopkins v. State*, No. 29816, 2010 WL 1718805 (App. Apr. 29, 2010)(SDO), and *DeWayne Asuega v. State*, S.P.P. No. 09–1–0012 (available on Ho'ohiki under Case ID 1PR091012 under "Court Minutes," entries 5 through 8), involved cases where the HPA could not have just relied on one factor, "Degree of Injury and/or Loss," in determining that an inmate was a Level III Offender, because the degree of injury and/or loss is the same in any case involving theft of over $20,000 (*Hopkins*) or negligent homicide (*Asuega*); therefore, the HPA must have used other criteria in determining Level III status that it did not specify.

Additionally, the State argued that *Coulter* did not hold that the HPA's failure to indicate the level of punishment and significant criteria in a minimum term order is a constitutional violation.

As to Fagaragan's third point of error (that he should not be categorized as a Level III Offender), the State responded that Fagaragan met Level III criteria under "Nature of Offense" based on the amount of drugs he possessed, and the other prongs under that criteria (that the crime was callous and cruel or that it was against a certain class of victims) were irrelevant. Further, the State argued that, under "Nature of Offense," Fagaragan fared poorly with regard to his "Character and Attitude of Offender With Respect to Criminal Activity," justifying a Level III categorization. Additionally, the State argued that Fagaragan also fared poorly under the categories "Efforts Made to Live a Pro–Social Life Prior to Commitment to Prison" and "Involvement of the Offender

in the Instant Offense(s)." Lastly, the State argued that Fagaragan was previously convicted and imprisoned in FC No. 02–1–0995 and asked the ICA to take judicial notice of those court records. The State asserted that all of these factors justified the HPA's determination that Fagaragan fit the characterization of a Level III Offender.

### 3. Reply Brief

In Fagaragan's Reply Brief, Fagaragan argued that he did not waive his claim that the HPA erred in its Order resetting his minimum terms by failing to raise the issue in his First Petition. He explained that, "HPA failed to correct their errors prior to him filing his initial petition." Fagaragan stated that he had never received HPA's Order until after filing his First Petition:

> The State argues at pg 21 that petitioner did not object to HPA's decision. How absurb!! Ridoulas!! HPA saw petitioner April–May 2008. HPA did not give their decision until 90 plus days later. How could he object the same day of hearing?

> Had petitioner receive response same day, he would have objected and argued this in his First Petition. Now the State says, "Hey you failed to raise this issue on First Petition and now it should be dismissed."

> Petitioner's Added New Claim Against HPA for the Violation of His Due Process Rights

> HPA and State prosecutors violated petitioner's due process rights when they did not give full notice of Petitioner's sentence on the on the day of hearing, thus denying him the right to appeal HPA's decision on a timely matter.

> Facts: HPA and the State violated petitioner's rights to further appeal H.P.A.'s decision when they illegally imposed a sentence of 20 yrs out of 20 yrs. HPA saw petitioner on April 2008, then serving him their response 90 plus days later, thus denying him the right to add this claim on his first Rule 35–40 Petition.

Fagaragan also pointed to a grossly inadequate law library as an extraordinary circumstance justifying his failure to previously raise the illegal procedures which HPA con-

ducted during the setting of his minimum term of imprisonment.

Fagaragan reiterated his earlier contentions that: (1) HPA deviated from its Guidelines by failing to list all three criteria on his minimum term order; and (2) *Coulter, Asuega, Hopkins,* and *Williamson* all stand for the proposition that a new hearing is required if HPA lists anything less than all three (or six) criteria.

Fagaragan responded to the points made in the State's Answering Brief. Fagaragan first disputed the State's claim that he has a prior conviction in FC No. 02–1–0995, asserting that the case was dismissed. Fagaragan next argued that the State cannot use "Character and Attitude of Offender with Respect to Criminal Activity," "Efforts to Live a Pro-Social Life Prior to Prison," and "Involvement of Offender" as justifying his Level III status, as none of these criteria were listed on HPA's minimum term order.

### 4. Summary Disposition Order

In its SDO, the ICA affirmed the trial court's Findings of Fact, Conclusions of Law, and Order Denying Rule 40 Petition for Post–Conviction Relief. The ICA found that Fagaragan "could have, but did not, challenge the HPA's fixing of the minimum terms of imprisonment on his convictions." Thus, the ICA concluded that Fagaragan "waived all the issues he raises in his Petition" for failing to raise them in his prior Rule 40 Petition without any showing of extraordinary circumstances justifying his failure, and the "Circuit Court did not err in denying his Petition without a hearing." The ICA further concluded that "in any event," Fagaragan's arguments on appeal "lack merit," as Fagaragan's promoting dangerous drug in the first degree convictions involved the manufacture, importation, distribution or cultivation of substantial quantities of drugs:

The HPA's "Guidelines for Establishing Minimum Terms of Imprisonment" (Guidelines) include under the criteria "Nature of Offense" for a level III level of punishment that "[t]he offense involved the manufacture, importation, distribution, or cultivation of substantial quantities of drugs." Fagaragan's Promoting Dangerous Drug I convictions fit this description. There is support in the record for the HPA's determination that under its Guidelines, Fagaragan fell within a Level III level of punishment with respect to his Promoting Dangerous Drug I convictions based upon the criteria of "Nature of the Offense."

*Fagaragan v. State,* No. CAAP-11-0000592, 2012 WL 4211909, *2-*3 (App. Sep. 19, 2012) (SDO) (emphasis added).

Accordingly, the ICA concluded that the HPA did not act arbitrarily or capriciously in setting Fagaragan's minimum terms for his convictions, and Fagaragan failed to show a colorable claim that the HPA's actions violated his constitutional rights.

### E. Application for Writ of Certiorari

On October 22, 2012, Fagaragan filed an Application for Writ of Certiorari (Application). Fagaragan presented seven questions. Question Presented E and G are stated as follows:

E. The court[ ] erred in denying petition for post-conviction pursuant to H.R.P.P. Rule 40 when stating that petitioner should have appealed H.P.A.'s decision when he received notice of the 20 yrs minimum sentence, which has stated that he did not receive the notice[ ] until some 90 days after decision, ineffective assistance.

G. The court[ ]s erred in denying petition for post-conviction pursuant to H.R.P.P. Rule 40 when stating that H.P.A. did not act arbitrarily and capriciously; when petitioner's sentence was over-turned in part. H.P.A. did not reset his original sentence they let it stand at 20 yrs, they should have reduced it.[11]

11. The remaining questions presented are as follows:

A. Whether the court[ ] erred in denying petition for postconviction pursuant to H.R.P.P. Rule 40 when stating that HPA does not have to follow Hawaii Revised Statutes (H.R.S.) § 706–669 which states H.P.A. shall list (1) nature of offense; (2) degree of injury and or

loss; and (3) criminal history of offender which is mandated by law when assessing minimum term sentences.

B. Whether the court[ ] erred in denying petition for postconviction pursuant to H.R.P.P. Rule 40 when stating that H.P.A. does not have to list all six special criteria's when assessing

Question Presented E asserts that Fagaragan did not receive notice that the HPA reset his minimum term to the same twenty-year minimum term after remand in time for him to have raised the issue in his First Petition. In explaining why he did not contest the HPA's decision in his First Petition, Fagaragan explains that "H.P.A. did not serve notice on Petitioner until 90 plus days later, thus Petitioner not arguing HPA's decision." "Had H.P.A. served Petitioner the same day when they let minimum term stand he would have added this claim." Additionally, Fagaragan responds to the ICA's finding that he waived the issue:

> It did not take the same day to hand out a prison sentence when he saw HPA in April–May 2008. He received response past the 90 day period to appeal. HPA caused the delay when mailing said decision. It was counsel and HPA who violated Petitioner's rights not Petitioner waiving said issue.

In Question Presented G, Fagaragan asserts that the HPA arbitrarily and capriciously reset his minimum sentence at the same twenty-year minimum term after his original sentence was overturned in part. Fagaragan argues that the HPA's deviation from its Guidelines for Establishing Minimum Terms of Imprisonment, without explanation, constitutes "arbitrary or capricious action that violates a prisoner's right." Specifically, Fagaragan points to the HPA's use of only one significant criteria, "Nature of Offense," in establishing his minimum terms of imprisonment as inconsistent with the requirements of HRS § 706–669(8) that minimum sentences be determined on a uniform basis.

Fagaragan requests that this court 1) order the HPA to conduct a new minimum term hearing; and 2) instruct the HPA to reset his level of punishment in conformance with the HPA Guidelines at Level I, or at most Level II.

The State did not file an opposition to the Application.

## II.

■ This court reviews a trial court's denial of an HRPP Rule 40 petition without a hearing for failure to present a colorable claim de novo. *Dan v. State*, 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994).

With respect to HPA decisions establishing a minimum term, this court has stated that "judicial intervention is appropriate where the HPA has failed to exercise any discretion at all, acted arbitrarily and capriciously so as to give rise to a due process violation, or otherwise violated the prisoner's constitutional rights." *Coulter*, 116 Hawai'i at 184, 172 P.3d at 496 (2007) (quoting *Williamson v. Hawai'i Paroling Auth.*, 97 Hawai'i 183, 195, 35 P.3d 210, 222 (2001)); *De La Garza v. State*, 129 Hawai'i 429, 439, 302 P.3d 697, 707 (2013).

■ With respect to claims of procedural violations, the court will assess whether the HPA complied with the procedural protections of HRS § 706–669 and complied with its own guidelines, which the HPA was required to establish by statute under HRS § 706–669(8). *Coulter*, 116 Hawai'i at 184, 172 P.3d at 496.

## III.

### A.

■ Fagaragan contends it was error to deny his Second Petition on the basis that he

---

inmates level of punishments as required per case law in *Hopkins v. State; Asuega v. State*. C. Whether the court[ ] erred in denying petition for post-conviction pursuant to H.R.P.P. Rule 40 when stating that a "first-time" offender shall serve the full maximum sentence twenty (20) years out of twenty (20) years while other who have 2–3–4 priors serve less time when they had double-triple amount of drugs than petitioner, thus denying him parole. D. Whether the court[ ] erred in denying petition for postconviction pursuant to H.R.P.P.

Rule 40 when stating that rapist-murders shall receive lesser minimum term sentences than a first-time drug offender.
. . . .
F. The court[ ] erred in denying petition for postconviction pursuant to H.R.P.P. Rule 40 when stating that petitioner does not fit the criteria under Article 1, § 5 of the Hawaii Constitution and pursuant to the 5th, 6th, and 14th amendments to the U.S. Constitution which states: "All persons in similarly situated situations should be treated alike."

"should have appealed H.P.A.'s decision when he received notice[ ] of the 20 yrs minimum sentence, [but] which … he did not receive … until some 90 days after decision." The ICA, however, found that in filing his First Petition, Fagaragan "could have, but did not, challenge the HPA's fixing of the minimum terms of imprisonment on his convictions." Consequently, the ICA concluded that in the absence of a showing of extraordinary circumstances, "Fagaragan waived the issues presented in his [Second] Petition, and the Circuit Court properly denied his [Second] Petition without a hearing."

> HRPP Rule 40(a)(3) provides as follows:
>
> Rule 40 proceedings shall not be available and relief thereunder shall not be granted where the issues sought to be raised have been previously ruled upon or were waived. Except for a claim of illegal sentence, an issue is waived if the petitioner knowingly and understandingly failed to raise it and it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or any other proceeding actually conducted, or in a prior proceeding actually initiated under this rule, and the petitioner is unable to prove the existence of extraordinary circumstances to justify the petitioner's failure to raise the issue. There is a rebuttable presumption that a failure to appeal a ruling or to raise an issue is a knowing and understanding failure.

(Emphases added).

■ Thus, "[a]n issue is waived if the petitioner knowingly and understandingly failed to raise it" (a rebuttable presumption of knowing and understanding failure arises from such omission), "and it could have been raised before the trial, at the trial, on appeal, … [in] any other proceeding actually conducted, or in a prior proceeding actually initiated under [Rule 40], and the petitioner is unable to prove the existence of extraordinary circumstances to justify … failure to raise the issue." *Fragiao v. State*, 95 Hawai‘i 9, 15–16, 18 P.3d 871, 877–78 (2001).

This court has held that a claim of ineffective assistance of counsel is not considered "waived" for the purposes of an HRPP Rule 40 petition if there was "no realistic opportu-

nity" for the petitioner to raise the claim in the proceedings specified by the rule. *See Briones v. State*, 74 Haw. 442, 459–60, 848 P.2d 966, 975 (1993) (holding that petitioner was unable to raise ineffective assistance of counsel issue on direct appeal where petitioner was represented by same counsel at trial and on direct appeal); *Fragiao*, 95 Hawai‘i at 16, 18 P.3d at 878 (2001) (finding no waiver of claim asserting trial counsel's conflict of interest where petitioner was unaware of conflict until new appellate counsel was appointed).

In *De La Garza*, we held that a petitioner seeking postconviction relief under HRPP Rule 40 presented sufficient evidence to rebut the presumption that he knowingly and understandingly waived the issue. 129 Hawai‘i at 443, 302 P.3d at 711. In that case, De La Garza asserted that he did not receive evidence containing adverse information in an HPA file prior to his second hearing and was thus deprived of a "meaningful opportunity to be heard on the issue of the minimum term." *Id.* at 441–42, 302 P.3d at 709–10. The ICA held that De La Garza had waived the issue by failing to raise it in the Rule 40 Petition. *Id.* at 442, 302 P.3d at 710. This court vacated the ICA's holding and held that "a claim … is not considered 'waived' for the purposes of a HRPP Rule 40 petition if there was 'no realistic opportunity' for the petitioner to raise the claim[.]" *Id.* at 442–43, 302 P.3d at 710–11.

In this case, Fagaragan's Second Petition and his Rule 40 Reply should have alerted the circuit court that there was a significant question as to whether Fagaragan had received HPA Order 2 prior to filing his First Petition. Fagaragan explained the reason for not previously presenting the claims for relief, "I thought that HPA would correct their errors but did not even though the ICA–Supreme Court ordered that the prior sentences were illegal. HPA should have corrected their erros [sic] violations without me submitting this but they continued."

■ That Fagaragan "thought HPA would correct their errors but did not" and HPA "should have corrected their errors without me submitting this" was an express

statement by Fagaragan to the circuit court that he had no knowledge of HPA Order 2 or its terms at the time he filed his First Petition. In his Rule 40 Reply, Fagaragan reiterated this assertion: "HPA failed to correct their errors prior to him filing his initial petition. Had HPA fixed the problem in the first place he would not have argued this." (Emphasis added). If the court considered Fagaragan's statements unclear or lacking in detail, HRPP Rule 40(e) [12] requires the court to give the petitioner an opportunity to clarify the petition prior to dismissing it for want of particularity.

In support of Fagaragan's contention that he was unaware of HPA Order 2 at the time he filed the First Petition was the timing between (1) HPA Order 2, (2) the date stamped on HPA Order 2 that indicated when it was mailed, and (3) the filing date of Fagaragan's First Petition. All three events occurred within a fairly narrow time frame, making any overlap between mailing, receiving, and filing dates more probable. HPA Order 2 is dated April 26, 2008; the date of mailing was May 5, 2008; and, Fagaragan filed his Second Petition on June 18, 2008. Therefore, the proximity of the timing between the documents, together with Fagaragan's statements that he was unaware of HPA's Order at the time he submitted his first petition, should have caused the circuit court, at a minimum, to seek clarification as to whether Fagaragan intentionally or knowingly waived the claims in his Second Petition.

Additionally, the contents of Fagaragan's First Petition did not reflect knowledge of the contents of HPA Order 2. Instead, the First Petition included a reference to "Conviction of Attempted Promotion of Controlled Substance" as an issue for review even though HPA Order 2 only included two offenses: "Promoting a Dangerous Drug in the

First Degree" and "Prohibited Acts Relating to Drug Paraphernalia." The offense Fagaragan raised in his First Petition, "Attempted Promoting a Drug in the First Degree[,]" only appeared in HPA Order 1.

Relatedly, after the ICA reversed Fagaragan's most serious conviction (Count II), Fagaragan presumably anticipated a reduction in his minimum terms of imprisonment after HPA held its second hearing. Had Fagaragan received HPA Order 2 with the identical minimum term, it would appear likely that there would have been a reference to it in the First Petition. Instead, the absence of any reference to HPA Order 2 substantiates Fagaragan's contention that he was not aware of its existence at the time he filed the First Petition.

### B.

In contrast to the evidence pointing to Fagaragan as having not received notice of the Order, the only countervailing evidence is a May 5, 2008 date that is stamped on HPA Order 2 indicating that a copy was "served" by mail to Fagaragan. Assuming HPA Order 2 was mailed on May 5, 2008, there is, however, no prison log, receipt of service, or other documentation indicating when the mail was received or forwarded to Fagaragan. The only record as to mailing or receiving is the stamped signature by the HPA Secretary with a stamped date on the order itself.

In *Setala v. J.C. Penney Co.*, 97 Hawai'i 484, 40 P.3d 886 (2002), this court acknowledged the unique circumstances pro se prisoners face because "a prisoner has no choice but to turn over his or her notice of appeal to prison authorities for forwarding to court clerks, [and] the pro se prisoner is not similarly situated with other civil litigants." 97 Hawai'i at 487, 40 P.3d at 889 (quoting *Houston v. Lack*, 487 U.S. 266, 275, 108 S.Ct. 2379,

---

12. HRPP Rule 40(e) provides the following:

Amendment and withdrawal of petition. The court may grant leave to amend or withdraw the petition at any time. Amendment shall be freely allowed in order to achieve substantial justice. No petition shall be dismissed for want of particularity unless the petitioner is first given an opportunity to clarify the petition.

(Emphasis added). A *pro se* petitioner "should not suffer for his inability to articulate his claim." *Garringer v. State*, 80 Hawai'i 327, 335-36, 909 P.2d 1142, 1150-51 (1996) (holding that before the court dismissed the petition without holding a hearing, petitioner should have been given an opportunity to clarify his petition by amending it to include specific factual allegations relevant to his claim).

101 L.Ed.2d 245 (1988)). As a result, the court adopted a "mailbox rule" holding that a pro se prisoner's notice of appeal is deemed filed on the day it is tendered to prison officials. *Setala*, 97 Hawai'i at 487-89, 40 P.3d at 889-91. The rationale behind the rule was that "[b]ecause 'the prisoner confined to his [or her] cell ... can usually only guess the prison authorities, the Postal Service, or the court clerk is to blame for any delay[,]' the prison may be the only entity that has evidence of the date of mailing." *Id.* at 489, 40 P.3d at 891 (citation omitted) (quoting *Houston*, 487 U.S. at 276, 108 S.Ct. 2379). The *Setala* court held that where there is no evidence of mailing, "appellate courts may remand the case to the trial court for a determination of when the notice was given to the prison authorities by the pro se litigant." *Setala*, 97 Hawai'i at 489, 40 P.3d at 891.

While *Setala* primarily dealt with notices of appeal, the holding is relevant in outlining the unique difficulties associated with pro se prisoners and the prison mailing system. Just as pro se prisoner litigants cannot personally travel to the courthouse to ensure their notice of appeal is filed by the clerk, pro se prisoner litigants cannot personally receive their own mail at the facility to ensure that mailed documents are actually received and timely delivered by the facility staff to the inmate.

As noted, Fagaragan's return address indicates he was incarcerated in Eloy, Arizona when he filed his First and Second Petitions. Fagaragan's physical location left him no other choice than to rely on the mail system as the only means of litigating his claim. Therefore, being subject to both the mail system and the prison authorities' delivery of his mail, Fagaragan's claim of having not received HPA's Order 2 prior to filing the First Petition merits is owed due consideration by the court, especially in light of the time proximity of the relevant documents.

### C.

The record of this case raises a significant question as to whether Fagaragan had a realistic opportunity to contest HPA Order 2 in the First Petition, and consequently whether Fagaragan intelligently and knowingly waived the claims set forth in the Second Petition.

■ As noted, HRPP Rule 40(a)(3) provides that there is a rebuttable presumption that a failure to raise an issue that could have been raised in a prior proceeding is a knowing and intelligent failure. If the presumption is not rebutted, then a court must determine whether the petitioner has proven the existence of extraordinary circumstances to justify the failure to raise the issue. If the petitioner is unable to prove the existence of extraordinary circumstances to justify the failure to raise the issue, then the issue is waived.

However, in this case, the circuit court made the following conclusion of law:

> Petitioner's allegations in the present Petition have been waived by Petitioner's failure to include them in the prior HRPP Rule 40 Petition, S.P.P. No. 08–1–0009, and Petitioner has failed to aver any facts that would "prove the existence of extraordinary circumstances to justify the petitioner's failure" to raise the issues previously. HRPP Rule 40)a)(3). Therefore, under HRPP Rule 40(a)(3) Petitioner has failed to rebut the presumption and has waived the claims in the present HRPP Rule 40 petition.

(Emphases added).

The circuit court erred by concluding that a failure to prove the existence of extraordinary circumstances is a failure to rebut the presumption and a "waive[r] of claims." To reiterate, a court must first determine whether a petitioner has rebutted the presumption of a knowing and intelligent failure to raise an issue. If the presumption is not rebutted, then the court determines whether the existence of extraordinary circumstances justifies the failure to have previously raised the claim.

■ On the other hand, if sufficient evidence is presented to rebut the presumption, then the court is not required to assess whether petitioner had proved the existence of extraordinary circumstances. *See De La Garza*, 129 Hawai'i at 443, 302 P.3d at 711

(2013) (holding that petitioner presented sufficient evidence to rebut the presumption and therefore the court was not required to evaluate the existence of extraordinary circumstances); *Fragiao*, 95 Hawai'i at 15–16, 18 P.3d at 877–78 (2001).[13]

Accordingly, once Fagaragan made a showing that the failure to raise his claims in the First Petition was not an intelligent and knowing failure, then it was unnecessary for the circuit court to reach the question of the existence of extraordinary circumstances, and the Second Petition should not have been denied without a hearing on the basis that the claims had been waived.

## IV.

■ HRPP Rule 40(a)(2) provides that "[a]ny person may seek relief under the procedure set forth in this rule from custody based upon a judgment of conviction. . . ." In the First Petition, Fagaragan sought relief from the judgment of conviction in Cr. No. 05–1–0090(1) <u>only</u>. Consequently, even assuming that the waiver doctrine of HRPP Rule 40(a)(3) applied to the Second Petition, the waiver would have applied only to claims that could have been brought in the First Petition that related to Cr. No. 05–1–0090(1).

In contrast, claims in the Second Petition that pertained to the minimum terms that HPA had imposed in Cr. No. 04–1–0595(1) had not been previously raised in any prior proceeding, nor could they have been raised, as no prior Rule 40 petition or other proceeding had challenged the setting of the minimum terms. The minimum terms in Cr. No. 04–1–0595(1) were set by the HPA after the appeal of the judgment of conviction had been filed on April 10, 2006, and no Rule 40 petition had been previously filed with respect to the judgment of conviction in Cr. No. 04–1–0595(1).

Therefore, the circuit court erred in concluding that "the allegations in the present Petition have been waived by [Fagaragan's] failure to include them in the prior HRPP Rule 40 Petition." Similarly, the ICA erred in finding that Fagaragan "could have, but did not, challenge the HPA's fixing of the minimum terms of imprisonment on his convictions," and Fagaragan "waived all the issues he raises in his Petition" for failing to raise these issues in his prior Rule 40 Petition.

Accordingly, the waiver doctrine prescribed by HRPP Rule 40(a)(3) was not applicable to the claims in the Second Petition that related to Cr. No. 04–1–0595(1). For this reason also, the Second Petition should not have been denied by the circuit court without a hearing premised upon a determination that all of Fagaragan's claims had been waived.

## V.

■ The legislature required the HPA to establish guidelines for the "uniform determination of minimum sentences which shall take into account both the nature and degree of the offense of the prisoner and the prisoner's criminal history and character." HRS § 706–669(8). Although the guidelines do not have the force of statutory law, "compliance with such rules is required to serve the legislature's goal of uniform determination of minimum sentences." *Coulter*, 116 Hawai'i at 185, 172 P.3d at 497 (quotation marks omitted). As stated by the *Coulter* court, "[t]he proposition that the government must follow the rules it sets out for itself is not controversial." *Id.* "Where the legislature has delegated the creation of guidelines for the uniform determination of minimum sentences to the HPA, the HPA is not free to ignore the guidelines it has established." *Id.*

---

13. *See also Tachibana v. State*, 79 Hawai'i 226, 232, 900 P.2d 1293, 1299 (1995) (holding that "where trial and appellate counsel are the same, no realistic opportunity exists for a defendant to raise the issue of whether that attorney usurped defendant's right to testify[,]" and not evaluating for extraordinary circumstances); *Briones*, 74 Haw. at 459, 848 P.2d at 975 (holding that "[w]here petitioner has been represented by the same counsel both at trial and on direct appeal, no waiver of the issue of trial counsel's performance occurs because no realistic opportunity existed to raise the issue on direct appeal[,]" and not evaluating for extraordinary circumstances); *Matsuo v. State*, 70 Haw. 573, 577–78, 778 P.2d 332, 334–35 (1989) (finding no realistic opportunity for a defendant to raise an ineffective assistance of counsel claim, and not evaluating for extraordinary circumstances).

■ The availability of the HPA Guidelines to prisoners serves as a procedural protection to safeguard prisoners' rights. *See Williamson,* 97 Hawai'i at 194, 35 P.3d at 221 (holding that "the procedural protections are adequate to safeguard prisoners' rights and ensure that the HPA does not arbitrarily set minimum sentences"). Therefore, deviating from minimum sentencing guidelines, without explanation, constitutes arbitrary or capricious action that violates a prisoner's right to uniform determination of his or her minimum sentence. *Coulter,* 116 Hawai'i at 184–85, 172 P.3d at 496–97; *see Williamson,* 97 Hawai'i at 194–95, 35 P.3d at 221–22.

■ In establishing the minimum term, the HPA considers a variety of factors including the prisoner's characteristics and the nature of the underlying offense. *See State v. Bernades,* 71 Haw. 485, 490, 795 P.2d 842, 845 (1990). Section III of the HPA Guidelines requires the Order Establishing Minimum Terms of Imprisonment to include the "specific minimum term(s) established in years and/or months, the level of punishment (Level I, II, or III) under which the inmate falls, and the significant criteria upon which the decision was based." [14] (Emphasis added).

■ In HPA Order 2, Fagaragan was determined by the HPA to have met the criteria for Level III Punishment. The HPA identified "Nature of Offense" as the sole significant criterion as the basis for its determination. To satisfy the "Nature of Offense" criteria for Level III classification, it is required that the offender meets the criteria of at least one of the following:

a. The offense was against a person(s) and the offender displayed a callous and/or cruel disregard for the safety and welfare of others; or

b. The offense involved the manufacture, importation, distribution, or cultivation of substantial quantities of drugs. Paragraph 4, subparagraph (a) or (b) of this section may be used to substantiate the level of involvement of the person in the offense(s);

c. The offense was committed against the elderly, a handicapped person, or a minor, and the conviction was for murder, sexual assault, robbery, assault, or kidnapping; and ... [.]

(Emphasis added). Since the entirety of the HPA's explanation for its determination of Fagaragan's level of punishment was "Nature of Offense," the relevant subsection was not identified. However, it may be presumed that the HPA intended subsection (b) to serve as the applicable subsection, as Fagaragan's offenses manifestly do not fall within subsections (a) or (c) of the Nature of Offense criteria for a Level III classification.[15]

Under subsection (b), the offense must involve "the manufacture, importation, distribution, or cultivation of substantial quantities of drugs." However, Fagaragan was convicted of offenses involving possession of unlawful contraband. None of the offenses in either Cr. No. 04–1–0595 or Cr. No. 05–1–0090(1) involved acts of manufacturing, importing, distributing or cultivating substantial quantities of drugs. Thus, the offenses for which minimum terms were imposed do not appear to fit the HPA's defined criteria under subsection (b) for Level III punishment.[16]

14. The criteria to designate a defendant for Level III punishment are as follows:
(1) the nature of offense; (2) the degree of injury/loss to person or property; (3) the criminal history; (4) the character and attitude of Offender with respect to criminal activity or lifestyle; (5) the efforts made to live pro-social life prior to commitment to prison; and (6) the involvement of offender in the instant offense(s).

15. "Nature of Offense" as defined in subsection (a)(callous offense against a person) and in subsection (c) (offense against the elderly) do not relate, even superficially, to Fagaragan's offenses and therefore are not applicable.

16. The dissent places great weight on the contention that: "although the attempted distribution count was reversed, ... [t]he two counts involved exactly the same conduct; therefore, Fagaragan's culpability remained exactly the same." Dissent at 246, 247, 320 P.3d at 911, 912. Respectfully, there is a significant difference in culpability between a distribution conviction and a conviction based on possession, even if the prescribed sentence is the same. There is also a significant difference in culpability when the conduct results in the commission of one Class A possessory drug conviction as compared to a Class A possessory and a distribution drug conviction. Moreover, a conviction for distribution, by definition, involves an act of distribution.

Nevertheless, the State contends that subsection (b) provides a basis to find that an offender manufactured, imported, distributed, or cultivated substantial quantities, despite the fact that there has been no adjudication that the offender actually did so. The State reaches this conclusion by its reading of the second sentence of subsection (b):

> b. The offense involved the manufacture, importation, distribution, or cultivation of substantial quantities of drugs. Paragraph 4, subparagraph (a) or (b) of this section may be used to substantiate the level of involvement of the person in the offense(s); [17]

According to the State, Paragraph 4, subparagraph (a) (the circumstances show criminal activity is a major source of person's livelihood) or subparagraph (b) (the person has unexplained substantial income) can establish that the offense involved manufacturing, importing, distributing or cultivating large quantities of drugs and thereby satisfy the criteria for Level III punishment criteria.[18] The State further contends that Fagaragan met Level III criteria under "Nature of the Offense" based on the amount of drugs he possessed.

 In evaluating the State's contentions, it is necessary to apply general principles of statutory construction. With respect to interpreting the HPA Guidelines:

> The general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an ad-

ministrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

*Int'l Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (emphasis added) (citations omitted).

Again, turning to the language of the HPA Guidelines, the "Nature of Offense" definition under subsection (b) of the Level III classification expressly provides:

> The offense involved the manufacture, importation, distribution, or cultivation of substantial quantities of drugs.

Thus, the offense must involve manufacturing, importing, distributing, or cultivating of substantial quantities of drugs. The next sentence provides:

> Paragraph 4, subparagraph (a) or (b) of this section may be used to substantiate the level of involvement of the person in the offense(s)[.]

(Emphasis added). Read in isolation, the second sentence is deprived of meaning and effect without allusion to the "offense(s)" being referred to. However, when read in reference with the first sentence, it is clear that the circumstances that may be used to "substantiate the level of involvement of the person in the offense(s)" are with respect to those offenses listed in the preceding sentence.

A conviction for possession does not. And, even if the counts "involved exactly the same conduct," there was no valid conviction for attempted distribution, as the circuit court failed to instruct the jury upon a requisite state of mind for an element of the attempted distribution offense, which the State conceded was plain error. *State v. Fagaragan*, 115 Hawai'i 364, 371–72, 167 P.3d 739, 746–47 (2007).

17. Section C titled "Level III," Paragraph 4, subparagraphs (a) and (b) provide as follows:

> 4. Character and Attitude of Offender With Respect to Criminal Activity or Lifestyle: Based on the person's character, attitude, and/or criminal history (both juvenile and

adult), future criminal activity remains probable; or

> a. The circumstances of the crime show that the convicted person has knowingly devoted himself or herself to criminal activity as a major or primary source of livelihood; or
>
> b. The convicted person has substantial income or resources not explained to be derived from a source other than criminal activity[.]

18. The ICA found that there was "support in the record for the HPA's determination that under its Guidelines Fagaragan fell within a Level III level of punishment with respect to his Promoting Dangerous Drug I convictions based on the crite-

In contrast, the State's interpretation would mean that any person who was found in possession of substantial quantities of drugs could be found to have been involved in acts of manufacturing, importation, distribution, or cultivation. This interpretation is problematical for several reasons.

First, this construction is contrary to the plain meaning of subsection (b), which states Paragraph 4, subparagraph (a) or (b) of this section may be used to substantiate the level of involvement of the person in the offense(s). Since the first sentence requires that the offense involve the manufacture, importation, distribution, or cultivation of substantial quantities of drugs, it is evident that Paragraph 4 subparagraphs (a) or (b) may be used to determine "the level of involvement" of the offender in manufacturing, importing, distributing, or cultivating substantial quantities of drugs. This is because the fact that an offender, for example, is involved in cultivating large quantities of drugs does not necessarily mean that the HPA will classify the person for Level III punishment.

Consequently, in the example given, an offender's level of involvement in cultivation of large quantities of contraband will affect HPA's determination regarding whether the offender is to be classified as a Level III offender. However, the level of involvement in the offense under paragraph 4 subparagraphs (a) or (c) is not relevant if the offense does not involve manufacture, importation, distribution or cultivation.

Second, the acts of manufacturing, importing, distributing, or cultivating substantial quantities of drugs would invariably involve possession. "Possession" in criminal law is broadly understood to include both actual and constructive possession. Black's Law Dictionary defines "possession" as: "The fact of having or holding property in one's power; the exercise of dominion over property." *Black's Law Dictionary* 1281 (9th ed. 2009).[19] Consequently, the enumerated acts of manufacturing, importing, distributing or cultivating would essentially be rendered superflu-

ous, as possession of substantial quantities of drugs would be able to meet the Level III criteria, regardless of the offender's underlying activity.

■ When construing a statute or administrative rule, courts are "bound to give effect to all parts of a statute, and ... no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *Keliipuleole v. Wilson,* 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997) (quotation marks omitted). The HPA demonstrated a level of certainty and precision in purposefully selecting the enumerated categories of acts in subsection (b) and to interpret this section in a way that would essentially allow the enumerated terms to be treated as surplusage is inconsistent with this purpose. *Id.* at 223, 941 P.2d at 306.

Third, Level III offenses are reserved for the most egregious conduct. It includes, for example, offenses against those most vulnerable in society, offenders who display a callous and cruel disregard for the safety of others, offenders with extensive criminal history, offenders who commit the most serious violent felonies, and offenders where "future criminal activity is determined to be probable."

Included in Level III classification are offenses that involve manufacturing, importation, distribution or cultivation of substantial quantities of drugs. The State would essentially expand this list to include "possession" offenses in order to allow the HPA to makes an inference that the offender was manufacturing, importing, distributing, or cultivating substantial quantities of drugs, despite the fact that the offender was never charged, much less, convicted of such activity.

Indeed, the offender could have been acquitted of the enumerated acts, or had their conviction reversed as Fagaragan did, and yet be found by the HPA (as Fagaragan was)

ria of 'Nature of Offense.' " *Fagaragan,* 2012 WL 4122909 at *3.

19. "Constructive possession" involves a person "who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over

a thing for a sufficient period to terminate his/her possession of it, either directly or through another person or persons[.]" Hawai'i Standard Jury Instructions Criminal (HAWJIC) 6.06, reprinted in Hawai'i Court Rules, State 866–67 (2013).

to have distributed substantial quantities of drugs.

Fourth, the canon of construction expressio unius est exclusio alterius, holds that "to express or include one thing implies the exclusion of the other, or of the alternative." *Black's Law Dictionary* 661 (9th ed. 2009). Under this principle, subsection (b) provides that the four specified offenses are exclusive and limit the category of applicable offenses to those expressly enumerated.

 This canon applies "only where in the natural association of ideas the contrast between a specific subject matter which is expressed and one which is not mentioned leads to an inference that the latter was not intended to be included within the statute." *Int'l Sav. and Loan Ass'n v. Wiig*, 82 Hawai'i 197, 201, 921 P.2d 117, 121 (1996). In this case, there exists a "natural association of ideas" between the type of specific offenses expressed in subsection (b) and the more general offense of "possession" because both offenses involve activities related to drug use. The distinction, however, lies in the HPA's deliberate use of specific offenses characterized as involving especially egregious activities under Level III "Nature of Offense."

As stated, the criteria for Level III punishment do not appear to apply to possession offenses, and unequivocally possession is not enumerated. Fagaragan stated in his Second Petition that he did not fit the Level III offender classification: "no one during trial testified that he sold or did any such act [of manufacturing, importation or distribution of drugs]," reflecting Fagaragan's understanding and a natural reading of the criteria.

The legislature specifically provided in HRS § 706–669(8) that "[t]he guidelines shall be public records and shall <u>be made available to the prisoner[.]</u>" (Emphasis added). Thus, the legislature contemplated that the HPA Guidelines would be an informational tool for the prisoner. The applicable statute, HRS § 706–669, is entitled "Procedure for determining minimum term of imprisonment," and clearly stated guidelines are an essential part of the process.

The importance of an offender being adequately informed of the applicable criteria cannot be overstated. The determination of whether the offender is classified for Level II punishment as opposed to Level III punishment for a Class A felony is a potential difference of 10 years of incarceration based upon the range of punishment established by the HPA.[20] In this case, the actual difference was 10 years of imprisonment, as Fagaragan's minimum term was set at 20 years.

In *D'Ambrosio v. State*, 112 Hawai'i 446, 146 P.3d 606 (App.2006), the court considered the critical nature of the minimum term hearing and the "significant discretionary power" exercised by the HPA in setting the minimum term of imprisonment. *Id.* at 464–66, 146 P.3d at 624–26. The court explained that under the statutory scheme, "it is the HPA, not the courts, that exercises most of the State's felony sentencing discretion." *Id.* at 464, 146 P.3d at 624.

In *De La Garza*, we held that a defendant in a minimum term hearing has a right to disclosure of adverse materials. 129 Hawai'i 429, 302 P.3d 697 (2013). We noted that "[s]uch disclosure ensures that the HPA will set the inmate's minimum term of imprisonment based on accurate information and that the inmate is given reasonable notice and a <u>meaningful opportunity to be heard</u> on the issue of the minimum term." *Id.* at 442, 302 P.3d at 710 (citing HRS § 706–669(3)) (emphasis added).

 Meaningful opportunity to be heard in the context of a minimum term hearing includes the right to be informed in a clear manner of the criteria that the HPA will use to set the minimum term. A clear statement of the criteria provides the offender with a meaningful opportunity at the HPA hearing to contest or adduce evidence that the offense did not involve distribution, manufacturing, importation or cultivation. Therefore, to comport with the requirements of a fair hearing, the HPA Guidelines should be readily understandable to accomplish their purpose in "be[ing] made available to the prisoner[.]" *See* HRS § 706–669(8).

---

**20.** The range in years of a minimum term for a Level II offender for a class A felony offense is 5–

10 years, while the range in years for a Level III offender for such an offense is 10–20 years.

## VI.

According to the HPA Guidelines, "[t]he Hawaii Paroling Authority may deviate from the guidelines, either above or below, but all deviations shall be accompanied by <u>written justification</u> and be made a part of the Order Establishing Minimum Terms of Imprisonment." (Emphasis added). In *Coulter*, the Hawai'i Supreme Court examined whether the HPA's actions were arbitrary and capricious when it set Coulter's minimum terms without stating in the order Coulter's level of punishment or providing any written criteria upon which the HPA based its decision. 116 Hawai'i at 183-85, 172 P.3d at 495-97. The court held that deviating from the rules established by the HPA for the uniform determination of minimum sentences, without explanation, constitutes arbitrary or capricious action that violates a prisoner's right to uniform determination of his or her minimum sentence. *Id.* at 185, 172 P.3d at 497.

In this case, HPA Order 2 identified Fagaragan as a Level III offender based on the criteria of "Nature of Offense." The HPA Guidelines provide three criteria under Level III "Nature of Offense," none of which, as discussed supra, are applicable to Fagaragan's offenses. Inasmuch as Fagaragan's offenses do not meet the prescribed criteria and no further "written justification" is provided explaining HPA's decision in HPA Order 2, HPA's action of classifying Fagaragan as a Level III offender was in violation of the HPA Guidelines and therefore, under the circumstances, arbitrary and capricious.

## VII.

For the foregoing reasons, we vacate the ICA Judgment, and the case is remanded to the circuit court to enter an order (1) vacating its Order Denying Rule 40 Petition, and (2) directing the HPA to hold a new hearing to determine Fagaragan's minimum terms of imprisonment in Cr. No. 04-1-0595(1) and Cr. No. 05-1-0090(1) pursuant to HRS § 706-669.[21]

Dissenting Opinion by RECKTENWALD, C.J., in which NAKAYAMA, J. Joins.

This case requires us to consider whether the Hawai'i Paroling Authority (HPA) erred in determining the minimum prison terms to be served by defendant Erwin Fagaragan. Fagaragan was convicted of multiple crimes in connection with two separate incidents. The HPA subsequently set minimum prison terms in both cases in a consolidated hearing. However, it later redetermined the minimum terms in one of those cases after a count in that case was reversed on appeal by the Intermediate Court of Appeals (ICA); when the HPA did so, it re-imposed the same minimum terms on the remaining counts.

In my view, the HPA did not act arbitrarily or capriciously in establishing Fagaragan's minimum terms. While in some circumstances the reversal of a count on appeal could change the HPA's assessment of the culpability of the defendant, that was not the case here. The reason is simple: the count that was reversed on appeal involved <u>exactly</u> the same underlying criminal conduct as one of the remaining counts of conviction. *State v. Fagaragan*, 115 Hawai'i 364, 370, 167 P.3d 739, 745 (App.2007). Indeed, that was explicitly the reason why that count was reversed, and the remaining count involving the same underlying conduct was allowed to stand. Thus, nothing material had changed about Fagaragan's culpability, and it was reasonable for the HPA to impose the same minimum terms. Accordingly, I respectfully dissent.

---

21. The minimum terms for Cr. No. 04-1-0595(1) and Cr. No. 05-1-0090(1) were set in HPA Order 1, and were based upon the consolidated evidence for both cases at the first minimum term hearing ("the [HPA] shall ... <u>on the basis of the hearing</u> make an order fixing the minimum term of imprisonment to be served before the prisoner shall become eligible for parole." HRS § 706-669(1) (emphasis added)). That hearing included the evidence of Fagaragan's attempted distribution conviction, which was subsequently reversed. Inasmuch as the only possible basis for the HPA in HPA Order 1 to determine Fagaragan was a Level III offender based on "Nature of Offense" was the reversed attempted distribution conviction in Cr. No. 05-1-0590(1), the new hearing setting the minimum terms must also include Cr. No. 04-1-0595(1). *See* HPA Guidelines at *1 ("The purpose of minimum sentencing guidelines is to provide a degree of uniformity and consistency in the setting of minimum terms[.]").

## I. FACTUAL BACKGROUND

One of the cases at issue here arose when Fagaragan was stopped by police after they observed him driving a stolen car. He was found to be in possession of more than 33 grams of methamphetamine packaged in packets, scales, glass pipes, empty packets, and $1,474 in cash. After a jury trial, he was convicted of several offenses in Criminal No. 04-1-0595(1), for which he was sentenced as follows: Promoting a Dangerous Drug in the First Degree (20 years), Unauthorized Control of a Propelled Vehicle (5 years), Prohibited Acts Related to Drug Paraphernalia (5 years), and Promoting a Detrimental Drug in the Third Degree (30 days).

The other case arose when Fagaragan was stopped by police and arrested on an outstanding warrant. *Fagaragan*, 115 Hawai'i at 365, 167 P.3d at 740. Police found $8,649 in cash in Fagaragan's pockets. *Id.* The car he was driving was searched and a bag was recovered that contained approximately 5.46 ounces of methamphetamine in 34 packets, a

pipe, and a digital scale. *Id.* He was charged in Criminal No. 05-1-0090(1) with three offenses: (1) Promoting a Dangerous Drug in the First Degree, in violation of Hawai'i Revised Statutes (HRS) § 712-1241(1)(a)(i)[1] (Count One); (2) Attempted Promoting a Dangerous Drug in the First Degree, in violation of HRS §§ 705-500 and 712-1241(1)(b)(ii)(A)[2] (Count Two); and (3) Prohibited Acts Related to Drug Paraphernalia (Count 3). *Id.* A jury found Fagaragan guilty on all counts, and he was sentenced to twenty year terms on both Counts One and Two, and five years on Count Three, to run concurrently. *Id.*

The HPA consolidated the two cases for purposes of setting minimum terms of imprisonment. After a hearing, the HPA issued an order that identified Fagaragan's "Level of Punishment" as Level III, and the "Significant factors identified in determining level of punishment" as "Nature of Offense." The order set the following minimum terms:

| Crime Number | Count | Offense | Maximum | Minimum |
|---|---|---|---|---|
| 04-1-595(1) | I | UCPV | 5 years | 5 years |
| 04-1-595(1) | II | PDD-1 | 20 years | 20 years |
| 04-1-595(1) | IV | Paraphernalia | 5 years | 5 years |
| 05-1-0090(1) | I | PDD-1 | 20 years | 20 years |
| 05-1-0090(1) | II | Att. PDD-1 | 20 years | 20 years |
| 05-1-0090(1) | III | Paraphernalia | 5 years | 5 years |

Subsequently, the ICA decided Fagaragan's appeal of the second case. *Id.* The ICA reversed Fagaragan's conviction of Attempted Promoting a Dangerous Drug in the First Degree, because it was based on the exact same conduct as the Promoting a Dangerous Drug in the First Degree charge for which he also was convicted. *Id.* at 366, 167 P.3d at 741. Specifically, the ICA found that "the legislature did not intend to authorize

the imposition of multiple punishments for both possession and attempted distribution under HRS § 712-1241, where the convictions are based on a defendant's possession of the same amount of drugs at the same moment in time." *Id.* at 369, 167 P.3d at 744.

In reaching that conclusion, the ICA relied on both the language and the legislative history of the statute. With regard to the former, the ICA noted that:

1. HRS § 712-1241(1)(a)(i) (Supp.2003) states in relevant part:

 A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
 (a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
 (i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

2. HRS § 712-1241(1)(b)(ii)(A) (Supp.2003) states in relevant part:

 A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
 (b) Distributes:
 (ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:
 (A) One-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

[T]he provisions relating to possession and distribution of methamphetamine are set forth in separate clauses within the same statute. Put differently, there is a single offense (Promoting a Dangerous Drug in the First Degree), which can be violated either by possessing a certain quantity of methamphetamine or by distributing a lesser quantity of methamphetamine. HRS § 712–1241(1)(a) and (b). The same maximum penalty applies whether a conviction is based on possession or distribution. HRS § 712–1241(2).

*Id.* at 369, 167 P.3d at 744 (footnote omitted).

With regard to the legislative history, the ICA quoted the following statement from the Judicial Council of Hawaii in explaining its proposed 1970 draft of the Hawaii Penal Code:

It is the purpose of the Code to hit hardest at the illegal trafficker in narcotics, dangerous drugs, marijuana concentrates, or marijuana. The scheme devised for so doing is to arrange the sanctions relating to each substance, either for possession or dispensing, on the basis of the amounts involved. Such amounts are meant to reflect, i.e., provide an indicia of, the position of the defendant in the illegal drug, marijuana concentrate, or marijuana traffic. Large amounts indicate the defendant is a main source of supply, sometimes called an "importer," "dealer," or "wholesaler." Middle amounts indicate that he is an intermediary between the main source and the consumer; sometimes the intermediary is called a "pusher," "carrier," or "retailer." Finally, the smallest amounts indicate the defendant's main involvement in the traffic is that of a user or consumer of drugs or substances. In keeping with the purpose of the Code, the greater the amounts involved the more severe the sanctions. Also, it will be noted that the offenses of dispensing a given substance are classed or graded one degree above

the possession of the same amount. Thus, for example, in secs. 1241 and 1242, the possession of "wholesale" amounts of a narcotic drug is a class A felony; however, the defendant who dispenses "retail" amounts of narcotics will receive the same sanction, whereas possession of that amount is a class B felony.

*Id.* at 370, 167 P.3d at 745 (emphasis added) (quoting Judicial Council of Hawaii, Hawaii Penal Code (Proposed Draft) at 346–47 (1970)).[3]

The ICA summarized its analysis as follows:

Consequently, it appears that the legislature intended that the possession of one ounce or more of methamphetamine, in situations such as the one now before us, would serve as a proxy for the intent to distribute under HRS § 712–1241. Put another way, the legislative history suggests that the legislature intended that possession and attempted distribution based on the possession at one moment in time of the same methamphetamine be punished as a single offense.

*Id.* at 370, 167 P.3d at 745.

After the ICA's decision was issued, the HPA held a hearing to reset Fagaragan's minimum terms in that case. It subsequently issued an order that again identified his "Level of Punishment" as Level III, and the "Significant factors identified in determining level of punishment" as "Nature of Offense." The order re-set the same minimum terms as the original order, i.e., 20 years for Promoting a Dangerous Drug in the First Degree and 5 years for Possession of Drug Paraphernalia.

## II. DISCUSSION

The majority contends that the HPA erred in determining that Fagaragan met the criteria for a Level III level of punishment.[4]

---

3. The 1972 legislature adopted section 1241 as proposed by the Judicial Council, with some amendments that are not relevant here. *Compare* Judicial Council of Hawaii, Hawaii Penal Code (Proposed Draft) at 342 (1970) *with* 1972 Haw. Sess. L. Act 9, § 1241(1) at 134.

4. The majority opinion also concludes that Fagaragan did not waive the issues that are addressed here, because there is a factual dispute about when he received notice of the HPA's decision re-setting his minimum terms. Majority opinion at 238, 320 P.3d at 903. I will assume arguendo that the majority's analysis on that

Majority opinion at 238–43, 320 P.3d at 903–08.

The HPA is required to set minimum terms in accordance with its Guidelines for Establishing Minimum Terms of Imprisonment (1989) (hereinafter "HPA Guidelines"). HRS § 706–669(8) (1993 & Supp.1996). The minimum sentences for particular offenses fall within ranges that are determined based on (1) the maximum sentence for the offense, and (2) whether the offender's level of punishment is classified as Level I, II, or III. HPA Guidelines at 2. The Guidelines set forth a number of criteria for each of the three levels. *Id.* at 3–7. In explaining the criteria, the Guidelines note that "[i]t should be emphasized that two of the primary criteria discussed under the three levels of punishment, Nature of Offense and Degree of Injury/Loss to Person or Property, are comparative and require awareness and knowledge by the Authority members of <u>offense circumstances</u> and past Authority decisions." *Id.* at 3 (emphasis added).

The first criteria for Level III is Nature of Offense, and provides in relevant part as follows:

 a. The offense was against a person(s) and the offender displayed a callous and/or cruel disregard for the safety and welfare of others; or

 b. The offense involved the manufacture, importation, distribution, or cultivation of substantial quantities of drugs. . . .

 c. The offense was committed against the elderly, a handicapped person, or a minor, and the conviction was for murder, attempted murder, sexual assault, robbery, assault, or kidnapping[.]

*Id.* at 5.

As noted by the majority, subsection (b) indicates that "[t]he offense" includes "distribution," but not possession, of "substantial quantities of drugs."[5] Majority opinion at 239, 320 P.3d at 904. The majority suggests that because the ICA reversed Fagaragan's

attempted distribution conviction, he no longer satisfies the criteria for Level III punishment because he was not convicted of distributing drugs. Majority opinion at 239, 320 P.3d at 904. There are several reasons why that argument must fail.

First, as noted above, although the attempted distribution count was reversed, the count that was based on possession of more than an ounce of methamphetamine remained intact. The two counts involved exactly the same conduct; therefore, Fagaragan's culpability remained exactly the same.

Second, as noted by the ICA, the legislature intended that possession of more than an ounce of methamphetamine "would serve as a proxy for the intent to distribute under HRS § 712–1241." *Fagaragan*, 115 Hawai'i at 370, 167 P.3d at 745. As noted by the Judicial Council in its 1970 report, "[l]arge amounts indicate that the defendant is a main source of supply, sometimes called an 'importer,' 'dealer,' or 'wholesaler.'" Judicial Council of Hawaii, Hawaii Penal Code (Proposed Draft) at 346. The statute was accordingly structured to punish a defendant who, like Fagaragan, possesses "'wholesale' amounts of a narcotic drug" the same as a defendant who "dispenses 'retail' amounts of narcotics": both of them are guilty of the same offense, Promoting a Dangerous Drug in the First Degree, with the same maximum sentence. *Id.* at 346–47, 167 P.3d 739; HRS §§ 706–659, 712–1241(2). Thus, the fact that Fagaragan's conviction on the attempted distribution count was reversed was immaterial.

Third, the HPA's guidelines allow the Authority to determine Nature of Offense based on the actual conduct of the defendant in committing the offense. This is reflected in several different ways in the Guidelines. Most notably, the criteria at issue here—that "[t]he offense involved the . . . distribution . . . of substantial quantities of drugs"—by

point is correct, but respectfully note that it does not follow, as the majority suggests, that the appropriate disposition would be to have the circuit court remand this matter to the HPA for purposes of resetting the minimum terms. Majority opinion at 243, 320 P.3d at 908. Rather, it would appear that the case should be remanded to the circuit court to resolve the factual dispute regarding notice prior to addressing the merits of

Fagaragan's petition. In any event, as set forth below, I do not believe that any remand is necessary since the HPA did not err in re-setting Fagaragan's minimum terms.

5. Fagaragan was convicted of possessing 5.46 ounces of methamphetamine, which is more than five times the minimum required for conviction under the statute. *See* HRS § 712–1241(1)(a)(i).

its very terms provides that it is sufficient if the offense "involved" distribution. HPA Guidelines at 5. It does not require that the defendant be convicted of an offense that has distribution as an element.

It is noteworthy that the drafters of the Guidelines knew how to distinguish between an offense and a conviction. Indeed, in the very next criteria after the one at issue here, the Guidelines recognize that distinction by providing that "[t]he offense was committed against the elderly, a handicapped person, or a minor, and the conviction was for murder, attempted murder, sexual assault, robbery, assault, or kidnapping[.]" HPA Guidelines at 5 (emphases added).

It also is significant that the preamble to the Guidelines' discussion of the Criteria provides that determining the Nature of Offense "require[s] an awareness and knowledge by the Authority members of offense circumstances." *Id.* at 3 (emphasis added). If, as the majority suggests, the analysis is driven solely by the elements of the counts of conviction, then "awareness and knowledge ... of offense circumstances" should be of little or no relevance. Moreover, contrary to the suggestion of the majority, majority opinion at 242–43, 320 P.3d at 907–08, this provision gives notice to offenders that they could be held accountable for distribution even if they were not convicted of an offense that includes distribution as an element.

### III. CONCLUSION

The ICA's decision reversing Fagaragan's conviction for Attempted Promoting a Dangerous Drug in the First Degree in Criminal No. 05–1–0090(1) had no effect whatsoever on Fagaragan's culpability. That is because of the unique circumstances of the case, i.e., he was convicted and sentenced in two separate counts for exactly the same conduct. Although one of those counts was reversed, the other was not. As a result, when the HPA reset his minimum term in 05–1–0090(1), they were faced with exactly the same person as before: he had done exactly the same things, and he therefore had exactly the same level of culpability. Thus, it was not arbitrary and capricious for the HPA to establish the same minimum terms on the re-

maining counts. Nor is there any way that Fagaragan's minimum sentences in Criminal No. 04–1–0595(1) could have been affected. Accordingly, I respectfully dissent.